Comput. Design & Integration, LLC v. Brown, 2018 NCBC 128.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 11847

COMPUTER DESIGN &
INTEGRATION, LLC and
COMPUTER DESIGN &
INTEGRATION SOUTHEAST, LLC,

       Plaintiffs,

v.

DAVID A. BROWN; MARCUS
JACOBY; and ROVE, LLC,

       Defendants,

DAVID A. BROWN and MARCUS
JACOBY,

       Third-Party Plaintiffs,

v.

ERIC BAKKER and BRIAN T. REID,
CPA,

       Third-Party Defendants,

v.

COMPUTER DESIGN &
INTEGRATION SOUTHEAST, LLC,
derivatively through DAVID A.
BROWN,

       Derivative Plaintiff,

v.

**ORDER AND OPINION ON
CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT**[1]

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of certain documents that the Court has previously allowed to remain filed under seal in this case, the Court elected to file this Order and Opinion under seal on December 10, 2018. The Court permitted the parties an opportunity to advise whether the Order and Opinion contained confidential information that any party contended should be redacted from a public version of this document. On December 12, 2018, Defendants requested the Court redact the names of certain non-party entities. After due consideration, the Court denied Defendants' request by Order dated December 14, 2018 (ECF No. 181), and this Order and Opinion is therefore filed, without redactions, as a matter of public record.

ERIC BAKKER; BRIAN T. REID, CPA (individually); ACCOUNTING OFFICES OF BRIAN T. REID, CPA; and NIGRO & REID,

    Derivative Third-Party Defendants.

1. **THIS MATTER** is before the Court upon the following motions in the above-captioned case: (i) Plaintiffs Computer Design & Integration, LLC ("CDI") and Computer Design & Integration Southeast, LLC ("CDISE") (collectively, "Plaintiffs") and Third-Party Defendants Eric Bakker ("Bakker"), Brian T. Reid ("Reid"), Accounting Offices of Brian T. Reid, CPA ("Reid Accounting"), and Nigro & Reid's ("N&R") (collectively, "Third-Party Defendants") Motion for Partial Summary Judgment (the "Plaintiffs' Motion")[2] and (ii) Defendants David Brown ("Brown"), Marcus Jacoby ("Jacoby"), and Rove, LLC's ("Rove") (collectively, "Defendants") Motion for Partial Summary Judgment (the "Defendants' Motion"), (together with the Plaintiffs' Motion, the "Motions").

2. Having considered the Motions, the parties' briefs, exhibits, and affidavits in support of and in opposition to the Motions, the pleadings, the arguments of counsel at the March 1, 2018 hearing on the Motions, and other appropriate matters of record, the Court hereby **GRANTS in part** and **DENIES in part** each of the parties' Motions.

---

[2] The Court notes that Plaintiffs and the Third-Party Defendants jointly briefed the present Motions and have substantially aligned interests. For ease of reference, the Court will attribute arguments advanced by Plaintiffs and the Third-Party Defendants solely to Plaintiffs.

*Bell, Davis and Pitt, P.A., by Edward B. Davis and Joshua B. Durham, for Plaintiffs Computer Design & Integration, LLC and Computer Design & Integration Southeast, LLC, Third-Party Defendants Brian T. Reid and Eric Bakker, and Derivative Defendants Accounting Offices of Brian T. Reid, CPA and Nigro & Reid.*

*Alexander Ricks, PLLC, by Mary K. Mandeville, Alice C. Richey, and Meredith S. Jeffries, for Defendants David Brown, Marcus Jacoby, and Rove, LLC.*

Bledsoe, Chief Judge.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

3. The Court does not make findings of fact on motions for summary judgment. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975). Instead, the Court summarizes the facts before it, noting undisputed and contested facts, to provide context for the claims and its ruling on the Motions. *Id.*

4. CDI and Brown are the two members of CDISE. This action arises out of Brown's failed buyout of CDI's interest in CDISE. In anticipation of the buyout, Brown created Rove to operate the CDISE business. During negotiations, Brown began preparations to launch Rove, including by contacting CDISE's customers, employees, and vendors and advising that CDISE was or would soon become Rove. After the buyout failed, Brown left CDISE's employment and began competing with CDISE through Rove in a number of ways, including by calling on CDISE's customers and hiring a number of CDISE employees. CDI and CDISE subsequently initiated this action asserting claims against Brown, Rove, and CDISE's former employee,

Jacoby. Brown and others responded with counterclaims, third-party claims, and derivative third-party claims. Through the Motions, all parties seek partial summary judgment.

A. CDI and the Creation of CDISE

5. CDI is a New York limited liability company ("LLC") with its principal place of business in Bergen County, New Jersey. (Compl.[3] ¶ 1, ECF No. 1.) CDI designs, deploys, and manages multiplatform hybrid IT solutions for businesses and often partners with technology companies in order to address the needs of its customers. (Compl. ¶ 6.) In particular, CDI is a "Value Added Reseller," or "VAR." (Ryan Aff. ¶ 3, ECF No. 77.) VARs resell hardware from technology manufacturers but include additional services with the sale, such as design, installation, and maintenance services. (Ryan Aff. ¶ 4.)

6. CDI organized CDISE as a North Carolina LLC with Brown's assistance in the fall of 2010 to expand CDI's business into the southeastern United States. (Compl. ¶¶ 2, 8–10.) Brown is a citizen and resident of Mecklenburg County, North Carolina, (Compl. ¶ 3), and CDISE maintains its principal place of business in Mecklenburg County, (Compl. ¶ 2).

7. CDI and Brown entered into a written operating agreement for CDISE dated November 5, 2010 (the "Operating Agreement"). (*See* Defs.' Mot. Dismiss, Answer, Countercls., and Third-Party Compl., Ex. A, at 1 [hereinafter "Operating Agreement"], ECF No. 22.6.) The Operating Agreement provided that Brown and

---

[3] Plaintiffs' Complaint was verified under oath by Erik Bakker, CDI's President.

CDI each held a fifty-percent membership interest in CDISE. (Operating Agreement A-1.) Under the Operating Agreement, Brown agreed to serve as President and handle the day-to-day management of CDISE, and Bakker, a citizen and resident of New York, (Defs.' Countercls. and Third-Party Compl. ¶ 6 [hereinafter "Countercls."], ECF No. 22), was appointed as CDISE's Vice President, (Operating Agreement §§ 6.3.2–6.3.3).[4]

8.     Under the Operating Agreement, CDI became the Managing Member of CDISE, a position defined in the Operating Agreement as follows:

> [T]he Managing Member shall have full, complete and exclusive authority, power and discretion to direct, manage and control the business, affairs and assets of [CDISE], to exercise any of the powers of [CDISE], to make all decisions regarding those matters, and to perform any and all other acts or activities it deems necessary, appropriate, proper, advisable or convenient with respect thereto.

(Operating Agreement § 6.1.1.)

9.     The Operating Agreement further provided that CDI would assume the role of "Tax Matters Partner" for CDISE, which required CDI to represent CDISE "in connection with all examinations of [CDISE]'s affairs by tax authorities, including any resulting judicial and administrative proceedings, and to expend [CDISE] funds for professional services and costs associated therewith." (Operating Agreement § 11.5.) CDI also assumed accounting responsibilities that included "caus[ing] the books and records of [CDISE] to be maintained in accordance with the accrual basis of accounting." (Operating Agreement § 11.2.)

---

[4] Brown served as CDISE's President until he resigned on June 16, 2016, (Brown Aff. ¶ 6, ECF No. 65), at which time Bakker took over as CDISE's President, (Bakker Aff. ¶ 2, ECF No. 40).

10. Reid is a citizen and resident of Bergen County, New Jersey, (Countercls. ¶ 7), and the Chief Financial Officer of CDI, (Reid Aff. ¶ 2, ECF No. 149). Reid is also a principal of Reid Accounting, an accounting firm located and operating in New Jersey, (Am. Countercls. and Third Party Compl. ¶ 169 [hereinafter "Am. Countercls."], ECF No. 89), and was formerly an owner of N&R, an accounting firm also located in New Jersey, (Am. Countercls. ¶ 170). By virtue of his position, and acting through either Reid Accounting or N&R, Reid assists CDI in fulfilling its duties under CDISE's Operating Agreement, which includes handling certain accounting, tax, and financial matters. (Derivative Third-Party Defs.' Answer ¶ 174, ECF No. 96.)

11. Jacoby is a citizen and resident of Rowan County, North Carolina, (Defs.' Answer ¶ 4, ECF No. 22), who started working for CDISE in February 2011, (Jacoby Aff. ¶ 3, ECF No. 63). He eventually became CDISE's Vice President of Sales. (Jacoby Aff. ¶ 3.) Jacoby held this position until his resignation from CDISE on June 22, 2016. (Jacoby Aff. ¶ 3.)

12. On October 27, 2015, Jacoby signed a standard confidentiality agreement with CDISE (the "Confidentiality Agreement"). (Bakker Aff. ¶ 9, ECF No. 40.) Jacoby and certain other CDISE employees signed Confidentiality Agreements, which were required of CDISE employees by new, larger customers as a condition of working with those accounts. (Exs. Reid Aff. 7–8, ECF No. 151.) Certain CDISE employees also signed covenants not to compete with the company. (Brown Aff. ¶ 98 [hereinafter "1st Brown Aff."], ECF No. 65.) Neither Brown nor Jacoby entered non-competition,

customer non-solicitation, or employee non-solicitation agreements with CDISE. (Defs.' Mot. Summ. J., Ex. 3, at 132:8–17 [hereinafter "CDI Dep. I"], ECF No. 116.4; Jacoby Aff. ¶ 21.)

B.  CDI's and CDISE's Tax Issues

13.  CDISE's revenues grew from $1.2 million in 2011 to over $50 million by 2015.  (Exs. Pls.' Mot. Summ. J. – Dep. Trs., Brown Dep. Ex., at 27:11–34:11 [hereinafter "Brown Dep. I"], ECF No. 110.)  During that time, CDISE failed to remit sales and use taxes to proper taxing authorities—including the North and South Carolina Departments of Revenue—until October 2015, even though CDISE's sales taxes were required to be paid either quarterly or monthly.  (Defs.' Br. Opp'n Pls.' Mot. Summ. J., Ex. 8, at 223:13–18, 238:4–21 [hereinafter "CDI Dep. II"], ECF No. 156.9; Brown Dep. I, at 27:11–30:13.)

14.  On November 29, 2017, Brown was notified by the South Carolina Department of Revenue Collection that CDISE was delinquent on its quarterly employee withholding tax for the fourth quarter in 2014 and the third quarter in 2015.  (Brown Aff. ¶¶ 2–6 [hereinafter "2nd Brown Aff."], ECF No. 158.)

15.  Reid, as CFO of CDI, was responsible for handling remittance of CDISE's sales taxes and fulfilling CDISE's state tax reporting requirements.  (CDI Dep. II, at 39:21–25, 221:7–222:24.)  Reid was also responsible for preparing and providing accurate financial statements to the members of CDISE, including Brown, on a quarterly and annual basis.  (CDI Dep. II, at 23:1–25:13, 56:8–57:4.)

16. Brown received one such statement, an annual balance sheet for the year 2014, sometime in March 2015. (2nd Brown Aff. ¶¶ 8, 10.) The balance sheet Brown received omitted a sales tax payable in the amount of $945,339.61 that CDISE owed at the time. (2nd Brown Aff. ¶ 8; Under Seal – Exs. Pls.' Mot. Summ. J., Ex. 149 [hereinafter "Balance Sheet"], ECF No. 114.) A document titled "Audit Trail" shows that on March 2, 2015 an individual made a journal entry in CDISE's QuickBooks file that reflected a payment made from CDISE's Sales Tax Payable Account in the amount of $945,339.61 to the United States Treasury (the "Journal Entry"). (Under Seal – Exs. Pls.' Mot. Summ. J., Ex. 151, at 1 [hereinafter "Audit Trail"], ECF No. 114.) One minute and twenty-one seconds later, however, the Journal Entry was deleted. (Audit Trail 1; CDI Dep. II, at 114:15–18; Rogers Aff. ¶ 4, ECF No. 157.) The balance sheet Brown received from CDI appears to have been printed out during the eighty-one seconds the Journal Entry appeared on the balance sheet. (2nd Brown Aff. ¶¶ 9–10; *see* Balance Sheet 1.) The balance sheet tendered to Brown omitted the tax payable to the U.S. Treasury. (2nd Brown Aff. ¶ 8; CDI Dep. II, at 109:8–116:16.)

17. CDI also experienced tax problems itself. On March 17, 2015, the New York State Department of Taxation and Finance ("New York Tax Department") issued a tax warrant against CDI in the amount of $386,145.47. (Vecchio Aff. ¶ 3, ECF No. 118; *see* Vecchio Aff., Ex. D, ECF No. 118.4.) The March 2015 tax warrant was docketed with the Albany, New York County Clerk of Court on March 17, 2015 and filed with the New York Department of State on March 18, 2015. (Vecchio Aff. ¶¶ 3–4; *see* Vecchio Aff., Exs. A–B, ECF Nos. 118.1, 118.2.) On May 27, 2015, the New York

Tax Department issued a second tax warrant against CDI in the amount of $888,361.52 (collectively with the March 2015 tax warrant, the "New York Tax Warrants"). (Vecchio Aff. ¶ 3; *see* Vecchio Aff., Ex. E, ECF No. 118.5.) The May 2015 tax warrant was docketed with the Albany, New York County Clerk of Court on May 27, 2015 and filed with the New York Department of State on May 28, 2015. (Vecchio Aff. ¶¶ 3–4; *see* Vecchio Aff., Exs. A–B.)

C. Brown's Negotiations with CDI for the Acquisition of CDISE

18. In the fall of 2015, Brown and CDI began negotiating Brown's purchase of CDI's 50% interest in CDISE. (Countercls. ¶¶ 40–41.) In December 2015, Brown and CDI signed a letter of intent whereby Brown, or a new entity to be formed, would acquire CDISE's assets for $16 million (the "2015 Term Sheet"). (Ex. Pls.' Mot. Summ. J. – Non-confidential Dep. Exs., Ex. 107 [hereinafter "2015 Term Sheet"], ECF No. 111.) The 2015 Term Sheet expressly provided that its terms were non-binding. (2015 Term Sheet 6.)

19. During the acquisition negotiations, Brown conducted due diligence with legal assistance from Alexander Ricks PLLC and accounting assistance from Potter & Company. (1st Brown Aff. ¶ 46; Under Seal – Exs. Pls.' Mot. Summ. J., Ex. 222, ECF No. 114.) The 2015 Term Sheet provided that Brown and his "Representatives" would have full and complete access to all of the books, records, properties, and assets of CDISE to conduct due diligence. (2015 Term Sheet 5.) As a result, Brown and his team received detailed financial information concerning CDISE, including its financial history, profit and loss information, and revenues. (Reid Aff. ¶ 3.) The 2015

Term Sheet subjected Brown and his team to confidentiality and non-disclosure obligations. (2015 Term Sheet 6.)

20. In February 2016, during due diligence, Reid provided Brown with the 2015 annual financial statements for CDISE. (1st Brown Aff. ¶ 56.) The 2015 annual financial statements showed that CDISE's September 2015 financial statements omitted approximately $1 million of costs and expenses. (1st Brown Aff. ¶ 56.) This and CDISE's tax issues prompted further negotiations that led to the creation of a new term sheet on April 1, 2016 (the "2016 Term Sheet"). (1st Brown Aff. ¶¶ 56–59.) The purchase price in the 2016 Term Sheet was reduced to $12.5 million. (1st Brown Aff. ¶ 59; *see* Ex. Pls.' Mot. Summ. J. – Non-confidential Dep. Exs., Ex. 108 [hereinafter "2016 Term Sheet"], ECF No. 111.)

D. Creation of Rove

21. Brown formed Brown Technology Group, LLC, now known as Rove, LLC, under North Carolina law in February 2016 in anticipation of his acquisition of CDISE. (1st Brown Aff. ¶ 50.) Brown has at all times served as the managing member and President of Rove. (Defs.' Answer ¶ 5.) Brown's plan was for CDISE to cease its operations after the acquisition and for Brown to continue those operations through Rove. (Defs.' Br. Opp'n Pls.' Mot. Summ. J., Ex. 1, at 143:18–144:23 [hereinafter "Brown Dep. II"], ECF No. 156.2.)

22. During the first half of 2016, Brown and others employed by or associated with Rove and/or CDISE worked on the anticipated acquisition and subsequent transition. (1st Brown Aff. ¶ 48; *see* Brown Dep. II, at 81:9–82:19.) Brown hired

several employees specifically to work for Rove, including Brian Calfo ("Calfo") to head Rove's operations and quotes and Chelsea Cancelliere ("Cancelliere") to serve as a Rove inside sales representative. (Bakker Aff. ¶ 8; 1st Brown Aff. ¶ 52.) Both Cancelliere and Calfo had full access to CDISE's sales system to assist with the anticipated acquisition. (Bakker Aff. ¶ 8; Bakker Aff. Exs., at 57–58, ECF No. 40.)

23. During this transition period, Rove employees exchanged numerous e-mails with attachments containing sensitive CDISE information. For instance, on May 4, 2016, Jacoby sent an e-mail to Brown and Rebecca Keyser ("Keyser"), a former CDISE employee who began working for Rove, containing a list of CDISE's customer opportunities and the work associated with each customer. (Bakker Aff. – Confidential Exs., at 119–28, ECF No. 41.) On May 17, 2016, Keyser sent an e-mail using a Rove e-mail address to Brown that contained an attachment labeled "2016 Pipeline," which included specific information regarding CDISE's customers and accounts. (Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 65, at 138–40, ECF No. 138.) Also in May 2016, Keyser received an e-mail through her Rove e-mail address with the attachment "rove – 13.pdf," which is a spreadsheet labeled "Employee Earnings Record" containing, among other things, information reflecting CDISE employees' hours, earnings, reimbursements, other payments, tax withholdings, and employee benefit deductions for 2013. (Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 71, at 141–84.)

24. Brown and his transition team also set up a Quotewerks system, which Rove uses to prepare quotes for customers. (Pls.' Dep. Excerpts (Sealed), at 44–46, ECF No. 141.) During the transition period, the Quotewerks system pulled customer

information from CDISE's comparable system—Connectwise. (Pls.' Dep. Excerpts (Sealed), at 45–46.)

25. Also in the transition to Rove's launch, in June 2016, Rove employees and agents obtained a number of CDISE's pricing proposals—known as Statements of Work ("SOW")—and quotes for existing and potential CDISE customers and sent those SOWs and quotes to customers using Rove e-mail addresses. (Answer ¶ 26; Durham Aff. – Confidential Exs., at 77–101, 102–23, 124–43, 144–48, 149–55, 156–72, 189–202, 203–41, 242–48, ECF No. 43.) Rove personnel represented to these customers that CDISE had been purchased by Rove and that, "going forward," CDISE would be known as Rove. (Pls.' Dep. Exs. Vol. 1, Ex. 93, ECF No. 137; Exs. Durham Aff., at 6, ECF No. 147.)

26. Despite the efforts to transition CDISE into Rove, the acquisition never occurred. Brown resigned as President of CDISE on June 16, 2016. (1st Brown Aff. ¶¶ 75–76.) Over the following weekend, Brown recruited CDISE personnel to join Rove. (Bakker Aff. ¶ 16.) On Sunday, June 19, 2016, a total of twenty-four CDISE employees resigned to join Rove. (Bakker Aff. ¶ 16.) Brown had determined which CDISE employees did not hold covenants not to compete with CDISE, and he offered positions at Rove to only those employees. (1st Brown Aff. ¶ 98.)

27. On June 20, 2016, Rove was officially opened for business. (Exs. Pls.' Mot. Summ. J. – Dep. Trs., Monza Dep. Ex., at 55:15–23 [hereinafter "Monza Dep."], ECF No. 110.) Jacoby resigned from CDISE on June 22, 2016 and became Rove's Vice President shortly thereafter. (Jacoby Aff. ¶ 3.)

28. In the immediate aftermath of the Rove/CDISE split, Rove employees removed certain CDISE computer equipment from CDISE's office, including a CISCO server, certain Meraki advanced security gear, and computer drives that were to be included in the CISCO server. (Bakker Aff. ¶ 18.) Defendants returned these items after demand by CDISE or its counsel. (Bakker Aff. ¶ 18.) Brown and Jacoby also removed equipment belonging to Sunbelt Rentals ("Sunbelt") that CDISE had been working to install under a contract with Sunbelt. (Bakker Aff. ¶ 18; Exs. Pls.' Mot. Summ. J. – Dep. Trs., Jacoby Dep. Ex., at 116:18–130:25, ECF No. 110.)

29. In the ensuing months, Rove obtained contracts with Octapharma, Ally, and Sunbelt—three customers that received Rove's SOWs and quotes in June 2016. (Confidential Exs. Durham Aff. (Sealed), at 187, 199–200, ECF No. 148; Pls.' Dep. Exs. Vol. 3 (Sealed), Exs. 104, 193, 194, ECF No. 139.)

E. Procedural Background

30. Plaintiffs filed a Verified Complaint initiating this action on June 30, 2016, asserting claims against (i) Brown for breach of the Operating Agreement, failure to negotiate in good faith, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty; (ii) Jacoby for breach of the Confidentiality Agreement; and (iii) all Defendants for misappropriation of trade secrets, conversion, tortious interference with contract, tortious interference with prospective economic relations, unfair or deceptive trade practices, and injunctive relief.

31. On August 31, 2016, Defendants filed their Answer to Plaintiffs' Complaint, and Brown filed counterclaims against Plaintiffs and third-party claims against the

Third-Party Defendants, both of which he amended on January 18, 2017.[5] Specifically, Brown asserted claims, either directly and/or derivatively on behalf of CDISE, against (i) CDI for declaratory judgment, breach of the Operating Agreement, and breach of fiduciary duties; (ii) CDISE for judicial dissolution; (iii) CDI and CDISE for indemnification and records inspection under N.C. Gen. Stat. § 57D-3-04; (iv) CDI, Reid, and Bakker for fraud, fraudulent concealment, negligent misrepresentation, and unfair and deceptive trade practices; (v) CDI, Bakker, Reid, Reid Accounting, and N&R for mismanagement of CDISE; and (vi) Reid, Reid Accounting, and N&R for professional negligence.[6]

32. After the close of discovery, the parties filed the Motions on November 17, 2017.

33. Defendants' Motion seeks summary judgment on Brown's individual and derivative claims for declaratory judgment and Plaintiffs' claims for breach of the Operating Agreement, breach of the duty to negotiate in good faith, breach of the covenant of good faith and fair dealing, misappropriation of trade secrets, tortious interference with contract, tortious interference with prospective economic advantage, Jacoby's breach of the Confidentiality Agreement, and conversion.

---

[5] Although Jacoby also filed counterclaims against Plaintiffs, he has since voluntarily dismissed those claims without prejudice.

[6] The Court issued opinions on the parties' preliminary motions in *Computer Design & Integration, LLC v. Brown*, 2016 NCBC LEXIS 96 (N.C. Super. Ct. Dec. 6, 2016), and *Computer Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8 (N.C. Super. Ct. Jan. 27, 2017).

34. Plaintiffs' Motion seeks summary judgment on Brown's claims for declaratory judgment, judicial dissolution, fraud, fraudulent concealment, negligent misrepresentation, unfair and deceptive trade practices, gross mismanagement, and professional negligence.

35. The Court held a hearing on the Motions on March 1, 2018, at which all parties were represented by counsel. The Motions are now ripe for resolution.

II.

LEGAL STANDARD

36. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). An issue is genuine if it is "supported by substantial evidence," and "an issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Id.* (citation and quotation marks omitted).

37. The Court views the evidence presented "in the light most favorable to the nonmoving party." *Day v. Rasmussen*, 177 N.C. App. 759, 762, 629 S.E.2d 912, 914

(2006). However, affidavits must "set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify." N.C. R. Civ. P. 56(e).

38. The moving party bears the burden of establishing a lack of any triable issue and may meet this burden by "proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim." *Roumillat v. Simplistic Enters., Inc.*, 331 N.C. 57, 62–63, 414 S.E.2d 339, 341–42 (1992).

39. "[O]nce the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." N.C. R. Civ. P. 56(e). Thus, a "motion for summary judgment allows one party to force his opponent to produce a forecast of evidence which he has available for presentation at trial to support his claim or defense." *Dixie Chem. Corp. v. Edwards*, 68 N.C. App. 714, 717, 315 S.E.2d 747, 750 (1984).

III.

LEGAL ANALYSIS

A.   Defendants' Motion

1.   CDI's Deemed Withdrawal as a Member of CDISE

40.   Defendants first argue that the filing of the New York Tax Warrants caused CDI's automatic withdrawal as a member of CDISE under Section 8.10 of the Operating Agreement.  As a result, Defendants contend that Brown, individually, and derivatively on behalf of CDISE, is entitled to a declaratory judgment that CDI has withdrawn as a member of CDISE.[7]  Defendants further contend that, because of that withdrawal, CDI (i) lacks standing to bring claims on behalf of CDISE or to cause CDISE to bring claims on its own behalf, thus compelling the dismissal of all claims asserted on CDISE's behalf for lack of subject matter jurisdiction; and (ii) cannot pursue claims premised on its membership interest, thus compelling dismissal of CDI's claims against Brown for breach of the Operating Agreement, breach of a duty to negotiate in good faith, and breach of the covenant of good faith and fair dealing.[8]

41.   "Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy such that he or she may properly seek adjudication of the matter." *Gateway Mgmt. Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC

---

[7] Plaintiffs' Motion similarly seeks partial summary judgment as to Brown's counterclaims for declaratory judgment.

[8] This Court has previously addressed CDI's authority under the Operating Agreement to cause CDISE to assert its claims in this action in resolving Defendants' motion to dismiss under Rule 12(b)(6).  *See Computer Design & Integration, LLC*, 2016 NCBC LEXIS 96, at *6–11.  However, Defendants did not seek dismissal in that motion based on the issuance of the New York Tax Warrants.

LEXIS 45, at *15 (N.C. Super. Ct. May 2, 2018) (quoting *Am. Woodland Indus., Inc. v. Tolson*, 155 N.C. App. 624, 626, 574 S.E.2d 55, 57 (2002)). "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction,*" Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002), and requires "that the plaintiff have been injured or threatened by injury or have a statutory right to institute an action," *Bruggeman v. Meditrust Co.*, 165 N.C. App. 790, 795, 600 S.E.2d 507, 511 (2004). "Whether a party has standing is a question of law." *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 372, 737 S.E.2d 771, 775 (2013). For a plaintiff to have standing to assert a derivative claim on behalf of an LLC, he "must either be 'a member of the LLC at the time of the act or omission for which the proceeding is brought' or acquire his ownership interest 'by operation of law from an ownership interest that was owned by a member at that time.'" *Wirth v. Sunpath, LLC*, 2017 NCBC LEXIS 84, at *9 (N.C. Super. Ct. Sept. 14, 2017) (quoting N.C. Gen. Stat. § 57D-8-01(a)(1)).

42. Here, Section 8.10 of the Operating Agreement, titled "LEGAL PROCEEDINGS AGAINST MEMBERS," provides in relevant part that "[t]he interests of [CDISE] and its Members would be seriously affected by any Transfer of any Member's Interest by any legal or equitable proceedings against such Member." (Operating Agreement § 8.10.)[9] The remainder of Section 8.10 sets forth five events, each of which will cause a member's automatic withdrawal as a member of CDISE:

---

[9] The Operating Agreement defines "Interest" as an "ownership interest in [CDISE]," which includes the right to vote, participate in management, and receive information "as provided in this Agreement and under the Act," and specifies that the ownership interest is "personal

[i]n the event that (a) there is a bankruptcy of a Member, (b) any portion of the Interest of any Member is attached, (c) any judgment is obtained in any legal or equitable proceeding against any Member and the sale of any portion of his Interest is contemplated or threatened under legal process as a result of such judgment, (d) any execution process is issued against any Member or against any of his Interest, or (e) there is instituted by or against any Member any other form of legal proceeding or process by which the Transfer of any portion of the Interest of such Member becomes imminent (i.e., such Interest being subject to Transfer either voluntarily or involuntarily within ninety (90) days), then, in any such event, the Member shall be deemed to have withdrawn as a member and the provisions of Section 9.2 shall apply.

(Operating Agreement § 8.10.) Brown contends that the issuance of the New York Tax Warrants caused CDI's automatic withdrawal from CDISE under subsections (b), (c), (d), and (e).

43. As an initial matter, the Court concludes that subsections (b), (c), and (e) of Section 8.10 are not implicated on the undisputed facts of record here. As noted previously, CDISE is a North Carolina LLC, and the Operating Agreement provides that it will be governed by North Carolina law. CDI's membership interest in CDISE, therefore, is personal property created and existing under North Carolina law. *See* N.C. Gen. Stat. § 57D-5-01 ("An ownership interest [in a North Carolina LLC] is personal property."). The North Carolina Limited Liability Company Act (the "LLC Act") provides that "the entry of a charging order is the exclusive remedy by which a judgment creditor of an interest owner may satisfy the judgment from or with the

---

property." (Operating Agreement § 1.1.5.) A "Transfer" of an Interest under the Operating Agreement includes "any direct or indirect sale, bequest, assignment, pledge, encumbrance or gift thereof, or attempt to deliver or grant a security interest therein." (Operating Agreement § 1.1.12.)

judgment debtor's ownership interest [in a North Carolina LLC]."[10] N.C. Gen. Stat. § 57D-5-03(d). Because it is undisputed that no charging order has been entered here, Brown's contention that the New York Tax Warrants attach, contemplate, or threaten the sale of, or constitute the imminent transfer of, CDI's membership interest and thus trigger subsections (b), (c), and (e) is without merit. None of those actions in New York are effective against CDI's membership interest in North Carolina in light of the plain requirements of section 57D-5-03.

44. Unlike subsections (b), (c), and (e), however, subsection (d) is not triggered solely by action against CDI's membership interest in CDISE. To the contrary, subsection (d) provides that withdrawal shall be deemed to occur when "any execution process is issued against any Member *or* against any of his Interest[.]" (Operating Agreement § 8.10(d) (emphasis added).) Under New York law, the filing of a tax warrant with the clerk of court of a county in the state of New York, as occurred here (*see* Vecchio Aff. Exs. A–B), shall be "deemed . . . [a] judgment against the taxpayer for the tax or other amounts[,]" N.Y. Tax Law § 1092(e). Section 1092(f) of the New York statute, titled "Execution," provides that the sheriff "shall thereupon proceed upon the warrant in all respects, with like effect, and in the same manner prescribed by law in respect to executions issued against property upon judgment[] of a court of record[.]" N.Y. Tax Law § 1092(f).

45. Based on the plain language of the New York statute, as well as that of the Operating Agreement, the Court concludes that the process titled "Execution" set

---

[10] *But see Drye v. United States*, 528 U.S. 49, 52 (1999) ("[S]tate law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States.").

forth in section 1092(f) constitutes an "execution process" as provided in Section 8.10(d) of the Operating Agreement, thus triggering Section 8.10(d) with respect to CDI's membership interest.

46. The Court's conclusion that Section 8.10 was triggered, however, does not end the inquiry. Plaintiffs further contend that Section 8.10 is void because the language of the Operating Agreement provides that if a triggering event occurs, "the Member shall be deemed to have withdrawn as a member *and the provisions of Section 9.2. shall apply*," (Operating Agreement § 8.10 (emphasis added)), and it is undisputed that the Operating Agreement does not contain a Section 9.2.[11] The parties vigorously dispute the legal ramifications of that omission.

47. Plaintiffs argue that the only way the Court can give effect to Section 8.10 is to supply a missing material term—Section 9.2—and that the Court is prohibited from doing so under longstanding principles of North Carolina contract law, citing, in particular, *JDH Capital, LLC v. Flowers*, in which this Court observed that "judicial interpolation of terms would amount to the court making a contract for the parties rather than enforcing something that could properly be regarded as the deal they had struck." 2009 NCBC LEXIS 8, at *17–19 (N.C. Super. Ct. Mar. 13, 2009) (quoting Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 Tex. L. Rev. 1581, 1587–88 (2005)). Defendants counter that Section 8.10's reference to the non-existent Section 9.2 concerns only what will occur after a member is

---

[11] The only section contained in Article IX of the Operating Agreement is Section 9.1, titled "Covenants." Section 9.1 memorializes each member's agreement "not to withdraw or attempt to withdraw from [CDISE]" and contains no language concerning post-withdrawal conduct or obligations. (Operating Agreement § 9.1.)

deemed to have withdrawn, and not whether withdrawal itself has been triggered. Defendants argue that the LLC Act fills the gap to address any material subject matter the parties have omitted, including the process following a member's withdrawal. After careful consideration, the Court agrees with Defendants.

48. To interpret LLC operating agreements, North Carolina courts employ general rules of contract construction. *See* N.C. Gen. Stat. § 57D-2-30(e) (stating that contract law "govern[s] the administration and enforcement of operating agreements" except as otherwise provided in the LLC Act); *N.C. State Bar v. Merrell*, 243 N.C. App. 356, 370, 777 S.E.2d 103, 114 (2015) ("An operating agreement is a contract."). Further, "[i]t is the policy of [the LLC Act] to give the maximum effect to the principle of freedom of contract and the enforceability of operating agreements." N.C. Gen. Stat. § 57D-10-01. Thus, the LLC Act and the common law "will apply only to the extent contrary or inconsistent provisions are not made in, or are not otherwise supplanted, varied, disclaimed, or nullified by, the operating agreement." *Id.* § 57D-2-30(a).

49. "In a contract dispute between two parties, the trial court may interpret a plain and unambiguous contract as a matter of law if there are no genuine issues of material fact." *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 605, 755 S.E.2d 56, 59 (2014); *see McKinnon v. CV Indus., Inc.*, 213 N.C. App. 328, 333, 713 S.E.2d 495, 500 (2011) ("Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts."). Moreover, "[p]arties can differ as to the interpretation of language without its being ambiguous[.]" *Walton v. City of*

*Raleigh,* 342 N.C. 879, 881–82, 467 S.E.2d 410, 412 (1996). "When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008).

50. When interpreting a contract, including an operating agreement, a trial court seeks to determine "the intent of the parties when the contract was issued" by deriving intent "from the language in the contract." *N.C. State Bar*, 243 N.C. App. at 370, 777 S.E.2d at 114 (quoting *Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 455–56, 750 S.E.2d 205, 209 (2013)). The language in a contract "should be given its natural and ordinary meaning," *Southpark Mall Ltd. P'ship v. CLT Food Mgmt.*, 142 N.C. App. 675, 678, 544 S.E.2d 14, 16 (2001), as there is "a strong presumption in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety," *Branch Banking & Tr. Co. v. Chicago Title Ins. Co.*, 214 N.C. App. 459, 464, 714 S.E.2d 514, 518 (2011). In determining the parties' intent, a court must construe a contract "in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." *Johnston County v. R. N. Rouse & Co.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992). To that end, this Court has observed that "courts have long used rules governing grammar as an aid to interpreting statutes, contracts and other written instruments." *Novant Health, Inc. v. Aetna U.S. Healthcare Carolinas, Inc.*, 2001 NCBC LEXIS 1, at *11 (N.C. Super. Ct. Mar. 8, 2001).

51.    Turning then to the language at issue, the second sentence of Section 8.10 is compound and contains two independent clauses—each of which may stand alone as a distinct sentence—separated by the conjunction "and." The first independent clause sets forth the five events (i.e. subsections (a) (b), (c), (d), and (e)) that will cause a member's automatic withdrawal as a member of CDISE. The second independent clause advises that the repercussions that follow from a member's withdrawal are set forth in Section 9.2. The first independent clause does not depend upon Section 9.2's existence and is not conditioned upon Section 9.2's application. As a matter of contract interpretation, therefore, the Court concludes that the omission of Section 9.2 from the Operating Agreement has no bearing on, and does not affect the validity of, the first independent clause in Section 8.10. Therefore, the first independent clause is enforceable as a standalone provision and, as applied here and without more, will result in CDI's deemed withdrawal. In these circumstances, the LLC Act will fill the gap left by the omitted Section 9.2 and address the repercussions of a member's withdrawal.

52.    Plaintiffs further contend, however, that even if CDI is deemed to have withdrawn from CDISE by operation of Section 8.10, which the Court has now found, Brown has, by his conduct, waived his right to enforce Section 8.10 without Plaintiffs' consent. North Carolina law is clear that "provisions of a written contract may be modified or waived by . . . conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived." *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 511, 722 S.E.2d 1, 6–7 (2012) (quoting *Whitehurst v.*

*FCX Fruit & Vegetable Serv., Inc.*, 224 N.C. 628, 636, 32 S.E.2d 34, 39 (1944)). Waiver can occur even where the instrument expressly prohibits it. *Id.* at 511, 722 S.E.2d at 7. Although waiver is generally "a mixed question of law and fact, it is solely a question of law when the facts are not in dispute." *Medearis v. Trs. of Meyers Park Baptist Church*, 148 N.C. App. 1, 11, 558 S.E.2d 199, 206 (2001).

53. "The essential elements of waiver are the existence at the time of the alleged waiver of a right, advantage or benefit, the knowledge, actual or constructive, of the existence thereof, and an intention to relinquish such right, advantage or benefit." *J.W. Cross Indus. v. Warner Hardware Co.*, 94 N.C. App. 184, 186, 379 S.E.2d 649, 650 (1989). "The question of waiver is mainly one of intention, which lies at the foundation of the doctrine." *Butler v. Charlotte-Mecklenburg Bd. of Educ.*, No. COA11-1312, 2012 N.C. App. LEXIS 675, at *11 (N.C. Ct. App. June 5, 2012) (quoting *Danville Lumber & Mfg. Co. v. Gallivan Bldg. Co.*, 177 N.C. 103, 107, 97 S.E. 718, 720 (1919)).

54. Plaintiffs base their waiver argument on the fact that Brown continued to negotiate with CDI over the purchase of CDI's membership interest in CDISE for more than a year after he learned of the New York Tax Warrants. Defendants counter that no waiver can be found on those facts because the LLC Act provides that after CDI's automatic withdrawal, CDI maintained a fifty-percent economic interest

in CDISE. Thus, Defendants argue, it was necessary for Brown to continue his negotiations with CDI as he did.[12]

55. The parties' conflicting positions have at their core whether Brown intended to waive CDI's deemed withdrawal from CDISE as he sought to negotiate the purchase of CDI's interest in CDISE. With evidence presented in support of both sides' contentions, the Court concludes that the matter is not susceptible to resolution on summary judgment. *See Estate of Hurst v. Jones*, 230 N.C. App. 162, 170, 750 S.E.2d 14, 20 (2013) ("[I]ntent is an operation of the mind, it should be proven and found as a fact, and is rarely to be inferred as a matter of law.").

56. Accordingly, for the reasons set forth above, the Court concludes that issues of material fact concerning whether Brown waived CDI's deemed withdrawal from CDISE preclude summary judgment on (i) Brown's individual and derivative claims for declaratory judgment; (ii) CDI's derivative claims asserted on behalf of CDISE to the extent Brown seeks dismissal based on CDI's withdrawal from CDISE; and (iii) CDI's claims against Brown for breach of the Operating Agreement, breach of a duty to negotiate in good faith, and breach of the covenant of good faith and fair dealing to the extent Brown seeks dismissal based on CDI's withdrawal from CDISE.

---

[12] An economic interest owner "owns an economic interest but is not a member." N.C. Gen. Stat. § 57D-1-03(11). An economic interest is the "proprietary interest of an interest owner in the capital, income, losses, credits, and other economic rights and interests of a limited liability company, including the right of the owner of the interest to receive distributions from the limited liability company." *Id.* § 57D-1-03(10). The LLC Act provides that a "member" is "[a] person who has been admitted as a member of the LLC as provided in the operating agreement . . . until the person ceases to be a member as provided in the operating agreement[.]" *Id.* § 57D-1-03(21).

2. <u>Misappropriation of Trade Secrets</u>

57. Defendants next seek dismissal of Plaintiffs' claims for misappropriation of trade secrets. Plaintiffs allege that Defendants wrongfully misappropriated various CDISE trade secrets for the use and benefit of Rove. Defendants contend that Plaintiffs have failed to demonstrate the existence of protectable trade secrets, failed to describe them with sufficient particularity, and failed to take reasonable steps to protect their secrecy.

58. North Carolina's Trade Secrets Protection Act ("NCTSPA") provides that the owner of a trade secret "shall have [a] remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153. A trade secret is defined under the NCTSPA as follows:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 66-152(3).

59. Generally, North Carolina courts consider the following six factors in determining whether information constitutes a trade secret:

> (1) [t]he extent to which information is known outside the business;
> (2) the extent to which it is known to employees and others involved in the business;
> (3) the extent of measures taken to guard secrecy of the information;

[(4)] the value of information to business and its competitors;

[(5)] the amount of effort or money expended in developing the information; and

[(6)] the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997). The *Wilmington Star-News* factors overlap, and courts considering these factors do not always examine them separately and individually. *SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2011 NCBC LEXIS 27, at *33–34 (N.C. Super. Ct. July 22, 2011).

60. A successful claim under the NCTSPA requires "a plaintiff [to] identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609–10, 811 S.E.2d 542, 547–48 (2018) (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326, 660 S.E.2d 577, 585 (2008)). Once a plaintiff has demonstrated that he has a trade secret, he "must also identify the actual acts of misappropriation with adequate specificity." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *28 (N.C. Super. Ct. Apr. 23, 2015). Actual or threatened misappropriation may be established by the introduction of "substantial evidence" that a person against whom relief is sought both "[k]nows or should have known of the trade secret" and "[h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155.

61. A defendant may rebut an owner's claim of misappropriation by proving that the defendant acquired the trade secret information through independent development or reverse engineering, that the information was received from another person with a right to disclose the information, or that the information is generally known in the industry. *Id.*; *see also id.* § 66-152(3)(a).

a. Sufficient Particularity

62. The Court first examines the threshold issue of whether Plaintiffs have described their alleged trade secrets with sufficient particularity. *See, e.g.*, *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003).

63. Plaintiffs' Complaint defined the scope of their trade secrets as follows:

[C]ustomer lists; the terms of CDI SE's contracts with such customers; the information technology needs of each customer; the proprietary and unique solutions designed for each customer by CDI SE; the engineering drafts and plans made to create such solutions; the potential solutions and configurations that were considered but rejected as not meeting the needs of the customer; pricing information; purchasing information for the solutions implemented for each customer; company financial information, including sales and profit information; sales proposals and quotes for potential customers; and correspondence with potential customers regarding their information technology needs.

(Compl. ¶ 58.)

64. At this juncture, Plaintiffs broadly describe these trade secrets as falling into one of six categories: (i) customer lists and customer opportunities (the "Customer Lists and Opportunities"), (ii) SOWs, (iii) quotes (the "Quotes"), (iv) CDISE financial information (the "CDISE Financial Information"), (v) employee information (the "Employee Information"), and (vi) miscellaneous materials (the "Miscellaneous Materials"). (Pls.' Br. Opp'n Defs.' Mot. Summ. J. 10–17, ECF No. 135.) Plaintiffs

may satisfy their burden on Rule 56 by actually producing the information that is the subject of their trade secrets claim. *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 545 (M.D.N.C. 2002) ("While categories alone would not sufficiently support [plaintiff's] claims, [plaintiff] has produced the actual customer list and vendor information that it claims are trade secrets." (citations omitted)).

65. With the exception of the Miscellaneous Materials category, Plaintiffs have presented evidence—in the form of documents, e-mails, affidavits, and deposition testimony—identifying with particularity the information in each of the first five categories they contend constitute trade secrets. Exemplar evidence can be found throughout the record. (*See, e.g.*, Bakker Aff. – Confidential Exs., at 119–28 (CDISE customer opportunity list and work summaries); Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 65, at 138–40 (2016 Pipeline); Durham Aff. – Confidential Exs., at 77–101 (Ally SOW), 102–23 (AgFirst quote), 124–43 (Spring Global quotes), 144–48 (Park Sterling Bank quote), 149–55 (Compass Group quote), 156–72 (Octopharma Plasma SOW), 189–202 (Sunbelt quotes), 203–41 (Medic SOWs and quotes), 242–48 (TradeKing quotes); Reid Aff. ¶ 3 (describing Financial Information); Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 71, at 141–84 (Employee Earnings Record).) The Court concludes that Plaintiffs' identification of these alleged trade secrets is sufficient to enable Defendants to delineate that which they are accused of misappropriating and the Court to determine whether misappropriation has occurred. Accordingly, the Court concludes that Plaintiffs have identified the Customer Lists and Opportunities, SOWs, Quotes,

CDISE Financial Information, and Employee Information (collectively, the "Identifiable Trade Secrets") with the particularity that our courts require and that Defendants' arguments to the contrary are misplaced.

66. The Court reaches a contrary conclusion, however, as to much of the alleged trade secret information in the Miscellaneous Materials category. This category—variously described as "proprietary and unique solutions," "engineering drafts and plans," "potential solutions and configurations," "correspondence with potential customers," and "information technology needs of each customer"—is broad, vague, and has not been identified with sufficient particularity, or supported with record evidence, to constitute a trade secret under North Carolina law. *See Stephenson v. Langdon*, No. COA09-1494, 2010 N.C. App. LEXIS 1682, at *15 (N.C. Ct. App. Sept. 7, 2010) (finding that in the absence of identifiable evidence articulating the specific information encompassed in the broadly defined categories of "customer lists, data, and contract information, as well as client data and client contact computer programs," plaintiffs "failed to identify the trade secret 'with sufficient particularity'" to survive summary judgment).

67. While a plaintiff does not have to "define every minute detail of its trade secrets down to the finest detail[,]" *DSM Dyneema, LLC v. Thagard*, 2014 NCBC LEXIS 51, at *18 (N.C. Super. Ct. Oct. 17, 2014), Plaintiffs here have not provided the sort of detail, or offered the sort of evidence, that enables Defendants to delineate that which they allegedly misappropriated or the Court to determine whether trade secret misappropriation occurred. As such, the Court concludes that Defendants'

Motion should be granted, with one exception, as to this remaining information. *See Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. 510, 519, 677 S.E.2d 868, 875 (2009) ("Summary judgment should be granted upon the nonmovant's failure to identify that information which it claims to be a trade secret that was misappropriated.").

68.     The only information Plaintiffs identify with sufficient particularity among the Miscellaneous Materials is CDISE's "Quick Start" Manuals.  Plaintiffs describe the content of these manuals, explain their purpose, and have placed them in the evidentiary record.  (*See* Duignan Aff. ¶ 5, ECF No. 142; Attachs. Duignan Aff. (Sealed), ECF No. 144.)  The Court concludes that Plaintiffs have identified the Quick Start Manuals with sufficient particularity to survive dismissal under Rule 56.[13]

### b.  Independent Actual or Commercial Value

69.     To survive Defendants' Motion, Plaintiffs must forecast evidence demonstrating that the Identifiable Trade Secrets possess commercial value "from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use[.]"  N.C. Gen. Stat. § 66-152(3); *see Analog Devices, Inc.*, 157 N.C. App. at 470, 579 S.E.2d at 454.

### (1) Customer Lists and Opportunities

70.     Plaintiffs claim that the Customer Lists and Opportunities that CDISE has amassed include some of their most sensitive trade secret information.  Plaintiffs have offered evidence showing that they developed and maintained detailed customer

---

[13]  Hereafter, the "Identifiable Trade Secrets" shall also include the Quick Start Manuals.

contact information in their Connectwise software system since 2011. (CDI Dep. I, at 150:10–155:2.) Plaintiffs have also tendered a CDISE "Pipeline" spreadsheet document reflecting CDISE's assessment of CDISE's potential to do business with specific customers, the vendors currently used by each customer, CDISE's "opportunity summary" for each customer, and other customer-specific information, including closing data and gross and net revenue projections. (*See* Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 65, at 138–40.)

71. Plaintiffs' evidence suggests that the Customer Lists and Opportunities information could not have been gathered or compiled without substantial time, expense, and difficulty. *See RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *32 (N.C. Super. Ct. Feb. 18, 2016) ("[W]hether a compilation or manipulation of information deserves trade secret protection depends on several factors, including the difficulty with which the information could be gathered, compiled, or manipulated."). Plaintiffs' evidence further suggests that the Customer Lists and Opportunities have independent actual or potential commercial value from not being generally known or readily ascertainable to persons who can obtain economic value from its disclosure or use. *See Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 56, 620 S.E.2d 222, 228 (2005) (concluding compilation of business information including customer identity, customer-specific pricing, and historic customer demand to constitute trade secrets); *S. Fastening Sys. v. Grabber Constr. Prods., Inc.*, 2015 NCBC LEXIS 42, at *11, *13 (N.C. Super. Ct. April 28, 2015) (holding "confidential customer information such as . . . customer buying preferences and history"

constituted trade secrets).  Accordingly, the Court concludes that Plaintiffs have met their burden under Rule 56 as to these alleged trade secrets.

(2) SOWs and Quotes

72.    CDISE prepared SOWs for customers and potential customers to show the services that CDISE might render in connection with any sale.  CDISE provided Quotes to its customers and potential customers that showed the prices of hardware and materials.  Defendants contend that Plaintiffs' SOWs and Quotes are not trade secrets under the *Wilmington Star-News* factors because their contents have little or no commercial value and largely consist of information available in the public domain.

73.    North Carolina courts have found that the information found in SOWs and quotes can constitute trade secrets.  *See, e.g., GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 233–34, 752 S.E.2d 634, 649 (2013) (finding pricing information, customer proposals, historical costs, and sales data to constitute trade secrets); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375–76, 542 S.E.2d 689, 692 (2001) (finding historical cost information to be a trade secret).  Ultimately, whether this type of information constitutes a trade secret depends on the efforts the claimant has undertaken to protect the information and whether the information would provide a significant advantage to a competitor.  *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *26–28.  Although the inquiry is fact-specific and varies from case-to-case, generally "where cost information remains confidential and derives commercial value

from that confidentiality, it may constitute a trade secret." *Id.* at \*27 (citing *GE Betz, Inc.*, 231 N.C. App. at 234, 752 S.E.2d at 649).

74.     The parties have submitted conflicting contentions and evidence as to the confidential nature of the SOWs and Quotes and their potential to add value to competitors.  Defendants offer affidavit testimony suggesting that (i) SOWs would be of no use to competitors because they are project specific, (ii) Quotes have a short shelf-life due to regular price changes and are thus valueless, and (iii) customers widely disseminated the information contained in Quotes and SOWs.  (*See* 1st Brown Aff. ¶¶ 94–95, 127.)  In opposition, Plaintiffs offer (i) affidavit testimony indicating that this information is highly proprietary, (*see* Bakker Aff. ¶ 10), (ii) exhibits showing that SOWs and Quotes contained confidentiality language restricting customers from disseminating the information, (*see* Pls.' Dep. Exs. Vol. 2 (Sealed), Exs. 28, 76; Pls.' Dep. Exs. Vol. 3 (Sealed), Ex. 140; Durham Aff. – Confidential Exs., at 77–101, 102–23, 124–43, 144–48, 149–55, 156–72, 189–202, 203–41, 242–48), and (iii) deposition testimony suggesting that many CDISE and Rove employees considered this information to have commercial value to competitors, (*see* Pls.' Dep. Excerpts (Sealed), at 59; Brown Dep. I, at 209:16–19 (acknowledging that a VAR's pricing information "could be helpful" to a competitor)).

75.     While stamping a document "confidential" does not make the information contained therein a trade secret under the NCTSPA, *Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1302 n.23 (E.D.N.C. 1996), the Court concludes that, based on the facts of record here, there is a factual dispute as to whether the information contained

in the SOWs and Quotes is sufficiently confidential and proprietary to constitute a trade secret under North Carolina law,[14] *see Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015) (finding customer quotes "that contain confidential information regarding [plaintiffs'] customers' desired products and services and [plaintiffs'] prices and discounts for products and services" constituted "plausible" trade secrets for purposes of a motion to dismiss); *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at *11 (noting that "confidential customer information such as . . . customer buying preferences and history" may constitute trade secrets); *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *31–32 (denying summary judgment where there was contested evidence as to whether plaintiff's compilation of historical prices offered to customers constituted a trade secret); *cf. Bldg. Ctr., Inc. v. Carter Lumber of the N., Inc.*, 2017 NCBC LEXIS 85, at *24–25 (N.C. Super. Sept. 21, 2017) (concluding price quotes were not trade secrets where quotes were not marked confidential and plaintiff did not explain how quotes could be a trade secret).

### (3) CDISE's Financial Information

76.    CDISE's Financial Information consists of CDISE's financial history, profit and loss information, revenues data, and information that can otherwise be found in CDISE's Quickbook files.  In the Preliminary Injunction Order, the Court found that Plaintiffs had shown a likelihood of success in establishing that this information

---

[14] Defendants contend that CDISE's Quotes and SOWs are available in the public domain and accessible through a simple Google search.  At the March 1 hearing, however, Defendants' counsel clarified that while many quotes and SOWs in the industry are available online, Defendants could not point to any CDISE Quotes or SOWs that were accessible through online searches.

constitutes protectable trade secrets. *See Computer Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at \*28 (N.C. Super. Ct. Jan. 27, 2017); *see also Sunbelt Rentals, Inc.*, 174 N.C. App. at 53–56, 620 S.E.2d at 226–28 (concluding compilation of information, including budget and salary information, constituted a trade secret); *XPO Logistics, Inc. v. Anis*, 2016 NCBC LEXIS 54, \*20–21 (N.C. Super. Ct. July 12, 2016) (concluding "business and financial information" constituted trade secrets). It appears that Defendants do not challenge the Court's earlier conclusion. Indeed, Keyser, a Rove employee, acknowledged that CDISE's "financial information" including "revenues and profit and loss and balance sheets" amounted to confidential and proprietary information. (Pls.' Dep. Excerpts (Sealed), at 61.) Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have offered sufficient evidence under Rule 56 to show that CDISE's Financial Information constitutes a trade secret.

(4) <u>Employee Information</u>

77. Plaintiffs claim that Defendants misappropriated CDISE's Employee Information, which Brown used to hire CDISE's employees based on the employment terms they had with CDISE.

78. Employee information can constitute trade secrets under the NCTSPA. *See Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658–59, 670 S.E.2d 321, 328–29 (2009) (holding "[plaintiff's] database, which contained [plaintiff's employees'] phone numbers, pay rates, specializations, and preferences regarding shifts and facilities" constituted trade secrets); *Sunbelt Rentals, Inc.*, 174 N.C. App. at 53–56,

620 S.E.2d at 226–28 (compilation of information, including personnel and salary information and organizational structure, constituted trade secrets).

79. Plaintiffs present evidence that Keyser, through her Rove e-mail address, received an e-mail with the attachment "rove – 13.pdf," which is a spreadsheet labeled "Employee Earnings Record." (Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 71, at 141–84.) The Employee Earnings Record contains information concerning CDISE's employees' "hours, earnings, and reimbursements & other payments," tax withholdings, and employee benefit deductions for 2013. (Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 71, at 142–84.) It also includes employees' addresses, the last four digits of their social security numbers, birthdates, hire dates, pay frequencies, and the date of their last raises. Plaintiffs have offered evidence that Brown used this information in making employment offers to CDISE employees. (Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 72, at 185; Pls.' Dep. Excerpts (Sealed), 65–66.)

80. The Court concludes that a jury could reasonably find that the Employee Earnings Record spreadsheet is a confidential "compilation of information" that contains information of "potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering." N.C. Gen. Stat. § 66-152. As such, Plaintiffs have made a sufficient showing that CDISE's Employee Information constitutes a protectable trade secret.

(5) Quick Start Manuals

81. CDISE's Quick Start Manuals are used by CDISE employees when proposing a technical solution to a customer. Plaintiffs have offered evidence that

the content of the Quick Start Manuals is derived from CDISE's long experience in implementing solutions to its customers' complex problems. Defendants provide evidence that similar manuals of competitors are publicly available, and that much of CDISE's Quick Start Manuals contain information found in those public manuals.

82. A compilation of information may constitute a trade secret where it has "value as a compilation or manipulation of information, even if the underlying information is otherwise publicly available." *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at *31–35 (holding plaintiff presented sufficient evidence that information and processes were unique and provided commercial benefit where plaintiff "spent much time and effort developing and customizing its information and processes"). Here, Plaintiffs have presented affidavit testimony that the Quick Start Manuals derive from CDISE's years of experience in the industry, that the information contained therein is unique and proprietary to CDISE, and that such information would be valuable to competitors. (*See* Duignan Aff. ¶ 5.) Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have offered sufficient evidence to show that the Quick Start Manuals contain information constituting protectable trade secrets.

### c. Reasonable Efforts to Maintain Secrecy

83. Defendants further contend that they are entitled to summary judgment because CDISE did not take reasonable steps to maintain the secrecy of any information alleged to be trade secrets.

84.    To receive trade secret protection, information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3)(b). This inquiry is fact-specific, and "courts that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are reasonable." *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at \*15 (N.C. Super. Ct. May 1, 2015).

85.    Plaintiffs have presented evidence that their employees' computers were password protected, that the CDISE handbook explicitly stated that "the protection of confidential business information and trade secrets is vital to the interests and the success of [CDISE]," (Exs. Reid Aff. 29), that some (but not all) employees signed Confidentiality Agreements, that physical access on the CDISE premises was restricted, and that much (but not all) of the information at issue was labeled confidential or subjected to restricted use. Defendants counter with evidence that the Confidentiality Agreements were not implemented until 2015, that many employees did not receive, review, and sign the handbook, and that access to CDISE's offices was not restricted to outsiders. (*See* 1st Brown Aff. ¶¶ 90, 93.)

86.    Defendants further contend that CDISE's confidential information—and specifically its Financial Information—lost trade secret protection because it was shared with Brown and Brown's representatives, including potential sources of financing, during the due diligence period. The 2015 Term Sheet provided that Brown and his representatives would have access to "books, records, properties and assets of [CDISE] for purposes of conducting such investigations and inspections[.]"

(2015 Term Sheet 5.) The 2015 Term Sheet also provided, however, that Brown and his representatives would not "disclose or use to the detriment of CDI any Confidential Information . . . except in connection with their evaluation of the proposed transaction." (2015 Term Sheet 5.) Further, the 2015 Term Sheet provided that, upon CDI's request, Brown and his representatives were required to promptly return all confidential information, destroy all notes analyzing any such information, and certify that they had done so. (2015 Term Sheet 5.)

87. The Court first concludes that CDISE's alleged trade secrets did not lose protection solely because they were shared with Brown and Brown's potential financers during the due diligence period. *Cf. Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 526, 586 S.E.2d 507, 512 (2003) (finding plaintiff lost trade secret protection for bid information where plaintiff agreed that the bid could be used and disclosed at defendant's sole discretion); *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *27 ("Where a plaintiff does not restrict a customer's . . . distribution of pricing information provided to the customer and acknowledges the customer's right to use that information, the pricing is not entitled to trade secret protection."). Indeed, trade secret information may be disclosed and remain protected if the evidence shows a "clear focus on efforts a business took to protect that information." *See Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *26–27.

88. The critical question in deciding this issue on summary judgment is "whether [Plaintiffs are] entitled to ask the jury to undertake an analysis of the

reasonableness of [Plaintiffs'] efforts to maintain the confidentiality of the information." *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at *38. Although Defendants have cast doubt on the adequacy of Plaintiffs' efforts to maintain the secrecy of their alleged trade secrets, viewing the evidence in the light most favorable to Plaintiffs, the Court cannot conclude as a matter of law that Plaintiffs have failed to adequately protect this information. *See, e.g.*, *id.* at *37–38 (holding confidentiality provision in handbook, password-protected computer systems, and employee confidentiality agreements created issue of material fact as to whether plaintiff took reasonable measures even where defendants "produced evidence that could lead a jury to doubt the adequacy of [plaintiff's] policies"); *Koch Measurement Devices, Inc.*, 2015 NCBC LEXIS 45, at *16 (declining to conclude as a matter of law that reasonable measures were not taken where plaintiff kept files in a locked room and used password-protected software); *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *32–33 (finding jury must resolve contested facts regarding plaintiff's efforts to protect trade secrets despite defendants' evidence); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2003 NCBC LEXIS 6, at *78 (N.C. Super. Ct. May 2, 2003) (finding reasonable efforts to maintain secrecy included "maintaining passwords on the computer system, not giving each employee a password, shredding of confidential documents, and requiring each employee to sign an employee handbook with a confidentiality provision").

### d. Actual or Threatened Misappropriation

89. "[O]nce a plaintiff has demonstrated that it has a trade secret, it must also present 'substantial evidence' of misappropriation[.]" *Safety Test & Equip. Co*, 2015 NCBC LEXIS 40, at *28. The evidence must show that a defendant "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155. Further, a plaintiff must identify the actual acts of misappropriation with adequate specificity. *See Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 586.

90. Plaintiffs have produced evidence tending to show that Rove employees e-mailed each other attachments containing CDISE's alleged trade secret information. Specifically, the record demonstrates that Rove employees sent e-mails attaching the "2016 Pipeline," which contains information relating to Customer Lists and Opportunities, and the "Employee Earnings Record," which contains Employee Information. The record further shows that Rove personnel stored a number of CDISE alleged trade secret documents, including the Quick Start Manuals, SOWs, and Quotes, into a cloud storage account called "withrove.box.com." (*See* McCullough Aff. ¶ 8, ECF No. 76; Bakker Aff. Exs., at 69; Durham Aff. – Confidential Exs., at 173–88, ECF No. 43.) The evidence also shows that Rove employees used CDISE information to create SOWs for Rove by "cop[ying] the items from the CDI SOW into the main sections" of the Rove SOW, and then sent those SOWs to potential customers. (Pls.' Dep. Exs. Vol. 2 (Sealed), Ex. 29, at 56–75; *see* Pls.' Dep. Exs. Vol. 2

(Sealed), Exs. 28, 81, 97.) Plaintiffs have also presented evidence permitting a factfinder to conclude that Rove subsequently obtained business from former CDISE customers who received Rove SOWs which were created using CDISE information. (*See* Confidential Exs. Durham Aff. (Sealed), at 79, 84, 125–26, 187, 199–203; Pls.' Dep. Exs. Vol. 3 (Sealed), Exs. 104, 193, 194.)

91. Viewing this evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have offered substantial evidence of misappropriation sufficient to reach a jury. *See Sunbelt Rentals, Inc.*, 174 N.C. App. at 57–58, 620 S.E.2d at 229 (finding sufficient evidence of misappropriation of plaintiff's customer information where former employee used pricing information after she began work with new company); *Byrd's Lawn & Landscaping, Inc.*, 142 N.C. App. at 376–77, 542 S.E.2d at 693 (holding "sufficient circumstantial evidence" of misappropriation existed where former employee had access to pricing proposals through employment with plaintiff, moved to another company, and caused customers to move their business to new company); *Safety Test & Equip. Co*, 2015 NCBC LEXIS 40, at *40–41 (concluding defendant's e-mail, which indicated defendant used plaintiff's historical pricing information to outbid plaintiff shortly after two of plaintiff's employees joined defendant, was sufficient to create a material issue of fact as to misappropriation); *see also Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 31 (N.C. Super. Ct. Apr. 10, 2018) (finding sufficient evidence of actual or threatened misappropriation under Rule 65 where former employees stored trade secret

information from former employer in a Dropbox account before starting a competing company).

92. In sum, the Court concludes that Plaintiffs have presented and forecasted sufficient evidence showing that (i) Plaintiffs' Identifiable Trade Secrets are protectable under the NCTSPA, (ii) Plaintiffs have implemented reasonable measures to maintain the secrecy of those Identifiable Trade Secrets, and (iii) Defendants have engaged in specific acts of trade secret misappropriation. As such, Plaintiffs have established a *prima facie* claim for misappropriation of trade secrets.

93. The Court therefore denies Defendants' Motion with respect to Plaintiffs' trade secret claims concerning the Customer Lists and Opportunities, SOWs, Quotes, CDISE Financial Information, Employee Information, and the Quick Start Manuals. Defendants' Motion is granted to the extent it seeks dismissal of Plaintiffs' claims arising out of the remaining Miscellaneous Materials.

### 3. Tortious Interference with Contract

94. Through their tortious interference with contract claim, Plaintiffs allege that Defendants interfered with existing contracts between CDISE and (i) its employees, including Defendant Jacoby, and (ii) its customers. Defendants contend that Plaintiffs have not shown the existence of valid contracts and thus that the claim should be dismissed as a matter of law.

95. In order to succeed on a claim for tortious interference with contract, a plaintiff must show:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

96. Here, the allegations involving CDISE's contract with its employees, including Jacoby, are based on the Confidentiality Agreements certain CDISE employees signed after their employment began. The evidence is clear that a number of employees signed the Confidentiality Agreements, but Defendants contend that the agreements are invalid for lack of consideration.

97. Every contract must be supported by consideration, and "[a] mere promise, without more, is unenforceable." *Inv. Props. of Asheville, Inc. v. Norburn*, 281 N.C. 191, 195, 188 S.E.2d 342, 345 (1972). Consideration consists of "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." *Elliott v. Enka-Candler Fire & Rescue Dep't, Inc.*, 213 N.C. App. 160, 163, 713 S.E.2d 132, 135 (2011).

98. Under North Carolina law, a "promise of continued at-will employment" is inadequate consideration for a post-employment confidentiality agreement. *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at \*7–8 (N.C. Super. Ct. June 9, 2017). While the employment itself may serve as consideration when an employee makes a promise as part of the initial employment terms, a later modification of the employment contract must be supported by new consideration. *Id.*

99.  Plaintiffs contend that consideration existed here because Jacoby and the other employees signed the Confidentiality Agreements so that CDISE could pursue larger accounts.  The evidence shows that the larger customers requested that CDISE employees sign the Agreements.  An e-mail to CDISE employees reads:

> Good news, we're growing very rapidly and getting into some larger accounts. Those larger accounts are requiring that we have certain control instruments in place both from a confidentiality as well as a compliance standpoint. Please find attached required confidentiality agreement.  I need this signed by each of you[.]

(Exs. Reid Aff. 7–8.)

100.  The employees, however, were not offered any personal gain or benefit from entering the Confidentiality Agreements.  Even if the larger accounts permitted the possibility of greater compensation to these employees as CDISE's revenue increased, a mere possibility of such a vague, future benefit does not constitute consideration under North Carolina law.  *See, e.g., Milner Airco, Inc. v. Morris*, 111 N.C. App. 866, 870, 433 S.E.2d 811, 814 (1993) (consideration consisting of a promise of promotion when business improved is illusory and thus unenforceable); *Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *17–18 (N.C. Super. Ct. Oct. 15, 2015) (holding restrictive covenant was not supported by consideration because employee's eligibility for discretionary raise was illusory, and there was no evidence that pay increases were directly related to execution of covenant).  Because Plaintiffs have not offered any evidence of consideration to support the Confidentiality Agreements, the Court concludes that the Confidentiality Agreements are invalid and thus that

Plaintiffs' claim for tortious interference with the Confidentiality Agreements should be dismissed.

101. Plaintiffs also assert a tortious interference of contract claim based on Defendants' alleged interference with CDISE's customer contracts. Plaintiffs, however, have not provided evidence of existing contractual agreements with customers, and deposition testimony demonstrates that customers were free to engage CDISE or other vendors at their sole election at any time. While Plaintiffs have produced evidence that customers doing business with CDISE began doing business with Rove, a mere expectation that customers would continue doing business with CDISE, without more, does not create a contractual relationship with which Defendants could tortiously interfere. *See Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700–01, 784 S.E.2d 457, 462–63 (2016) (affirming grant of summary judgment on tortious interference with contract claim where plaintiff could show only a general business relationship with customers and not specific, valid contracts). The Court thus concludes that Defendants' Motion seeking dismissal of Plaintiffs' claim for tortious interference with customer contracts should be granted.

4. Tortious Interference with Prospective Economic Advantage

102. Through their tortious interference with prospective economic advantage claim, Plaintiffs allege that Defendants intentionally and maliciously interfered with CDISE's prospective business relationships with various customers.

103. A claim for tortious interference with prospective economic advantage exists "when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, . . . if damage proximately ensues[.]" *Id.* at 701, 784 S.E.2d at 463 (quotation marks omitted). Thus, "a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Id.* Further, a "'plaintiff's mere expectation of a continuing business relationship is insufficient' to satisfy the 'but for' causation element of such a claim." *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 47, at \*49 (N.C. Super. Ct. May 31, 2017) (quoting *Beverage Sys.*, 368 N.C. at 701, 784 S.E.2d at 463). A defendant's actions may be privileged, however, if the interference is for a legitimate business purpose. *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988) (holding that competition in business constitutes justifiable interference and is not actionable where it is "carried on in furtherance of one's own interests and by means that are lawful").

104. Plaintiffs offer evidence of three potential contractual relationships that CDISE allegedly lost as a result of Defendants' actions: Octapharma, Ally, and Sunbelt Rentals. Defendants respond that the work Rove conducted for these three customers was different from the work CDISE intended to perform for those companies, and further, that CDISE's potential projects with these accounts were not specific and identifiable but rather uncertain.

105. Plaintiffs have offered evidence showing that CDISE maintained these three accounts in their business pipeline and that the work Rove obtained from these accounts was the same work that CDISE had been performing. (*See* Confidential Exs. Durham Aff. (Sealed), at 187, 199–200, ECF No. 148; Pls.' Dep. Exs. Vol. 3 (Sealed), Exs. 104, 193, 194.) Plaintiffs' evidence also tends to show that Rove employees, in securing these accounts' business, represented that Rove's buyout of CDISE was complete, that CDISE was being liquidated, and that Rove was formerly CDISE, none of which was true after negotiations fell apart. (*See* Pls.' Dep. Exs. Vol. 1 Ex. 93; Exs. Durham Aff. at 6.)

106. Defendants contend that their conduct was privileged because it was in furtherance of Rove's legitimate business interests and thus justified. *Peoples Sec. Life Ins. Co.*, 322 N.C. at 220, 367 S.E.2d at 650. However, "[j]ustified interference . . . 'is lost if exercised for a wrong purpose . . . where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved.'" *Hopkins*, 2017 NCBC LEXIS 47, at \*51 (quoting *Peoples Sec. Life Ins. Co.*, 322 N.C. at 220, 367 S.E.2d at 650). The difference between justified and unjustified interference turns on the presence of legal malice, or "the intentional doing of the harmful act without legal justification." *Lenders Funding, LLC v. WAIM Mgmt. Co.*, 2018 NCBC LEXIS 67, at \*8 (N.C. Super. Ct. July 6, 2018) (citing *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954)); *see Pack Bros. Body Shop v. Nationwide Mut. Ins. Co.*, 2003 NCBC LEXIS 2, at \*32 (N.C. Super. Ct. Jan. 10, 2003) ("The word 'malicious' used in referring to malicious

interference with formation of a contract does not import ill will, but refers to an interference with design of injury to plaintiffs or gaining some advantage at [plaintiffs'] expense." (quoting *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 241–42 (2000))). Thus, whether Defendants' conduct here was privileged depends upon whether Defendants acted "by means that are lawful," and "the circumstances surrounding the interference, [Defendants'] motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of [Defendants] and the contractual interests of [Plaintiffs]." *Peoples Sec. Life Ins. Co.*, 322 N.C. at 221, 367 S.E.2d at 650.

107. The Court concludes that Defendants' alleged conduct—securing work for Rove at CDISE's expense by using CDISE's resources while Brown and Jacoby were still employed at CDISE and falsely representing that CDISE was going out of business to advance Rove's business interests—is the sort of conduct that constitutes legal malice under North Carolina law. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 111, at *20–21 (N.C. Super. Ct. Dec. 1, 2017) (allowing counterclaim for tortious interference with prospective economic advantage to proceed where defendants alleged that plaintiff's defamatory statements to third parties caused third parties to not do business with defendants); *cf. Beverage Sys.*, 368 N.C. at 700, 784 S.E.2d at 462 (noting that interference with a contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors").

108.  Accordingly, the Court concludes that Defendants' Motion should be denied to the extent it seeks dismissal of Plaintiffs' claim for tortious interference with prospective economic advantage as to CDISE's prospective work for Octapharma, Ally, and Sunbelt Rentals.  However, Defendants' Motion shall be granted as to other unidentified prospective accounts.

### 5.  Breach of Confidentiality Agreement

109.  Plaintiffs claim that Jacoby breached his Confidentiality Agreement by misappropriating confidential information and making use of that information to CDISE's detriment.  As discussed above, the Court has concluded that the Confidentiality Agreement was not supported by consideration, and thus, is unenforceable.  Accordingly, Plaintiffs' claim against Jacoby for breach of the Confidentiality Agreement must necessarily be dismissed.  *See RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at \*50–51 (granting summary judgment and dismissing claim for breach of a confidentiality agreement against former employees who signed agreement after they began employment and no other consideration was given).

### 6.  Failure to Negotiate in Good Faith

110.  Plaintiffs allege that Brown had a duty to continue good faith negotiations with CDI until he acquired CDISE.  Plaintiffs contend that Brown breached this duty by continuing to extend the closing date with no intention of completing the transaction and by using the extension to recruit employees, develop a plan to compete with CDISE, and establish Rove as a competing company.

111. Defendants challenge this claim by arguing that the parties did not enter into a binding agreement of any sort, citing for support this Court's holding in *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77 (N.C. Super. Ct. Oct. 7, 2016). Plaintiffs respond by arguing that the parties had a long, unique relationship and had agreed on most of the material terms of the intended transaction.

112. The parties do not dispute the facts surrounding the Term Sheets or the negotiations—only whether those facts support a valid claim for failure to negotiate in good faith. The issue therefore is ripe for judicial determination at summary judgment. The Court agrees with Defendants and concludes that the parties did not enter a binding agreement to negotiate in good faith and thus that Brown did not owe Plaintiffs any such duty.

113. In *Insight Health Corp.*, this Court held that "an agreement to continue to negotiate in good faith could be enforceable 'provided that it me[ets] all of the requirements for contract formation under North Carolina law[.]'" *Insight Health Corp.*, 2016 NCBC LEXIS 77, at *8 (quoting *RREF BB Acquisitions, LLC v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61, at *57 (N.C. Super. Ct. June 9, 2015)). However, a duty to negotiate in good faith, and thus a successful claim for failure to negotiate in good faith, typically may not be premised on a non-binding letter of intent. *Id.* at *11 (noting that letters of intent are generally found to be unenforceable "agreements to agree"); *see Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *17–18 (N.C. Super. Ct. Dec. 12, 2016) (concluding a provision

in a non-binding letter of intent that represented parties would act in "good faith and good will" did not create a binding agreement to negotiate in good faith); *JDH Capital, LLC*, 2009 NCBC LEXIS 8, at *15–16, *22 (holding letter of intent that provided it was non-binding, contemplated future agreements, and left material terms undecided was unenforceable).

114. Neither Term Sheet here reflected an agreement that the parties would continue to negotiate in good faith in an effort to complete the transaction. Indeed, the Term Sheets do not contain any provision discussing the conduct of future negotiations or either party's obligations in pursuit of the contemplated transaction. Thus, as in *Insight Health Corp.*, the express and unambiguous language of the Terms Sheets "makes plain that there was no binding agreement [under the Term Sheets] to continue negotiations at the time of the alleged breach." *Insight Health Corp.*, 2016 NCBC LEXIS 77, at *11.

115. Moreover, the Term Sheets signed by CDI and Brown—each labeled a "Letter of Intent"—expressly provide that:

> [T]his is a NON-BINDING term sheet and is not intended to, and will not, create any obligation on any party hereto to consummate the transaction contemplated by this term sheet; it being acknowledged that any such obligation will only arise upon the parties' execution of a Purchase Agreement and other mutually acceptable agreements.

(2015 Term Sheet 6–7; 2016 Term Sheet 8.) Each Term Sheet also provides that it "may be terminated at any time, and for any or no reason, by either party by giving written notice to the other party." (2015 Term Sheet 6; 2016 Term Sheet 7.) Indeed, the Term Sheets expressly provide that the final purchase was conditioned on

Brown's "satisfaction" during due diligence. (2015 Term Sheet 4; 2016 Term Sheet 5.) Such language emphasizing the nonbinding nature of the Term Sheets and the absence of any contract language requiring good faith negotiation further demonstrates that the parties did not make a binding agreement to negotiate in good faith. *See Remi Holdings, LLC*, 2016 NCBC LEXIS 110, at *19 ("[H]aving concluded that the Letter of Intent expresses the desires of the parties but not the agreement of both, it would be illogical to conclude that a perfunctory reference to the parties' good faith in that same Letter of Intent creates a binding agreement." (citation and quotation marks omitted)).

116. Contrary to Plaintiffs' contention, the fact that the Term Sheets identify certain terms as "BINDING," including provisions addressing "Confidentiality," "Non-Disclosure," and "Access to Information," (2015 Term Sheet 4–7; 2016 Term Sheet 5–8), does not change this result. These provisions only address certain obligations that will arise from any negotiations that may occur. They do not create a binding obligation to negotiate in the first place. *See Remi Holdings, LLC*, 2016 NCBC LEXIS 110, at *17–19 ("The Court is not persuaded that [a] representation of the parties' good faith and good will [in an expressly non-binding letter of intent] creates a binding agreement to negotiate in good faith."); *Insight Health Corp.*, 2016 NCBC LEXIS 77, at *15–16 (finding that a confidentiality clause, a clause requiring compliance with due diligence, and a description of the letter of intent as an "agreement" did not render letter of intent an enforceable agreement to negotiate in the future).

117. Accordingly, the Court concludes that Defendants' Motion should be granted dismissing Plaintiffs' claim against Brown for failure to negotiate in good faith.

### 7. Conversion

118. Plaintiffs claim that Defendants converted CDISE's assets, including (i) equipment owned by SunBelt Rentals that was in CDISE's possession (the "Sunbelt Equipment"); (ii) certain computer hardware, including a Cisco server, Meraki security gear, and Data Domain equipment, (the "Computer Hardware"), and (iii) business records in both tangible and electronic forms (the "Business Records"). Defendants argue that these claims should be dismissed because Plaintiffs (i) did not own the Sunbelt Equipment, (ii) suffered "no harm" when Defendants "inadvertently" removed the Computer Hardware, (iii) have produced no evidence that Defendants removed tangible Business Records from CDISE, and (iv) have "not shown any loss of their use" of the electronic Business Records. (Defs.' Br. Supp. Defs.' Mot. Partial Summ. J. 24, ECF No. 117; Defs.' Reply Br. Supp. Defs.' Mot. Partial Summ. J. 12–13, ECF No. 170.1.)

119. Under North Carolina law, "[t]he tort of conversion is well defined 'as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). The Court of Appeals has emphasized that "[t]he essence of conversion is not the acquisition of property by

the wrongdoer, but a wrongful deprivation of it to the owner[.]" *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008) (quoting *Lake Mary L.P. v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (2001)). In short, "there is no conversion until some act is done which is a denial or violation of the plaintiff's dominion over or rights in the property." *Mace v. Pyatt*, 203 N.C. App. 245, 256, 691 S.E.2d 81, 90 (2010) (quoting *Lake Mary L.P.*, 145 N.C. App. at 532, 551 S.E.2d at 552).

120. The undisputed facts of record show that Sunbelt Rentals owned the Sunbelt Equipment that is partially the subject of Plaintiffs' conversion claim. CDISE was in possession of the equipment under a contract by which CDISE agreed to install the equipment for Sunbelt Rentals. Because Plaintiffs did not own the Sunbelt Equipment, it cannot properly be the subject of a conversion claim. *See Bartlett Milling Co.*, 192 N.C. App. at 86, 665 S.E.2d at 489 (finding that ownership by plaintiff is an essential element necessary for conversion). Consequently, Plaintiffs' claim for conversion of the Sunbelt Equipment should be dismissed.

121. As to Defendants' alleged conversion of the Computer Hardware, the Court concludes that Plaintiffs' conversion claim should survive Defendants' Motion. Although Defendants argue that the Computer Hardware was inadvertently taken and promptly returned upon request, and further that Plaintiffs suffered no harm by the inadvertent taking, North Carolina law only "requires an 'unauthorized' taking of property," *Cox v. Roach*, 218 N.C. App. 311, 327, 723 S.E.2d 340, 351 (2012), "regardless of the subsequent application of the converted property," *N.C. State Bar*

*v. Gilbert*, 189 N.C. App. 320, 324, 663 S.E.2d 1, 4 (2008); *see Hawkins v. Hawkins*, 101 N.C. App. 529, 533, 400 S.E.2d 472, 475 (1991) (noting that actual damage is not an essential element of conversion), *aff'd*, 331 N.C. 743, 417 S.E.2d 447 (1992). As a result, the Court concludes that Defendants' Motion should be denied as to the alleged conversion of the Computer Hardware.

122. Plaintiffs also claim that Defendants wrongfully converted certain tangible and electronic Business Records. With respect to the tangible Business Records, Plaintiffs allege that Defendants removed sensitive records, including customer records, invoices, sales histories, sales forecasts, and employee records from locked file drawers at CDISE. (Compl. ¶ 32.) Such records may be properly the subject of a conversion claim. *See Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 331, 572 S.E.2d 200, 207 (2002) (holding "proprietary information, including customer lists, contact lists, records and historical data" was the proper subject of a conversion claim); *Addison Whitney, LLC*, 2017 NCBC LEXIS 51, at *16. Defendants argue that Plaintiffs' claim for conversion of this information should be dismissed because Plaintiffs have failed to offer competent evidence that any tangible Business Records were converted. The Court agrees.

123. The only evidence Plaintiffs offer that identifies the allegedly converted tangible Business Records is found in their Verified Complaint. Although a "trial court may not consider an unverified pleading when ruling on a motion for summary judgment," verified complaints may be treated as affidavits for that purpose. *Rankin v. Food Lion*, 210 N.C. App. 213, 220, 706 S.E.2d 310, 315 (2011) (quoting *Tew v.*

*Brown*, 135 N.C. App. 763, 767, 522 S.E.2d 127, 130 (1999)). Specifically, a court may treat a verified complaint as an affidavit if it "(1) is made on personal knowledge, (2) sets forth such facts as would be admissible in evidence, and (3) shows affirmatively that the affiant is competent to testify to the matters stated therein." *Page v. Sloan*, 281 N.C. 697, 705, 190 S.E.2d 189, 194 (1972). In applying this test, North Carolina courts have "repeatedly held that statements made upon information and belief—or comparable language—do not comply with the personal knowledge requirement[.]" *Asheville Sports Props., LLC v. City of Asheville*, 199 N.C. App. 341, 345, 683 S.E.2d 217, 220 (2009) (internal quotation marks omitted).

124. Here, the relevant allegation in Plaintiffs' Verified Complaint is asserted "[u]pon information and belief." (*See* Compl. ¶ 32 ("Upon information and belief, Defendants Brown and Jacoby also removed sensitive business records belonging to CDISE, including customer records, invoices, sales histories, sales forecasts, and employee records.").) As such, the allegation is not based on Plaintiffs' personal knowledge, and the Court may not consider it in ruling on Defendants' Motion. Because Plaintiffs have failed to offer otherwise competent evidence in support of their claim, Plaintiffs' claim for conversion of tangible Business Records taken from CDISE's offices must be dismissed under Rule 56.

125. In contrast, however, Plaintiffs have presented evidence suggesting that Defendants converted and deprived Plaintiffs of access to certain electronic Business Records. While conversion may exist for the taking of electronic documents in appropriate circumstances, *see Addison Whitney, LLC*, 2017 NCBC LEXIS 51, at *15–

16 ("The better view, and the weight of authority, treats electronic documents as personal property subject to a claim for conversion."),[15] copying "electronically-stored information[,] which does not deprive the plaintiff of possession or use of information, does not support a claim for conversion," *id.* at *17 (quoting *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at *53 (N.C. Super. Ct. June 20, 2016)); *see also SQL Sentry, LLC v. ApexSQL, LLC*, 2017 NCBC LEXIS 107, at *6 (N.C. Super. Ct. Nov. 20, 2017) (dismissing conversion claim and noting "under North Carolina law, allegations of mere copying of electronically stored information are insufficient to state a claim for conversion"); *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at *55 (dismissing conversion claim where plaintiff did "not allege that Defendants copied and then deleted the information so as to deprive [plaintiff] from its continued use of the information"); *Horner Int'l Co. v. McKoy*, 2014 NCBC LEXIS 68, at *8 (N.C. Super. Ct. Dec. 18, 2014) (dismissing conversion claim where plaintiff did "not allege it was deprived of the information or excluded from use of the information allegedly converted by Defendant").

126.    Plaintiffs contend that they were deprived of access to two sets of electronic Business Records.   First, Plaintiffs allege that one of the servers that Defendants removed contained CDISE's back-up records for its Syncplicity system.  (*See* Duignan Aff. ¶¶ 3–4.)  CDISE used Syncplicity, a program similar to Dropbox but with local file storage, to store and share project documents.  According to Plaintiffs' evidence,

---

[15]  Federal courts in North Carolina take a different approach in their analysis of this issue. *See Aym Techs. LLC v. Rodgers*, 2018 NCBC LEXIS 14, at *43–44 (N.C. Super. Ct. Feb. 9, 2018) (noting the different approach taken in the federal district courts of North Carolina).

CDISE was unable to access the information stored in Syncplicity until Defendants returned the server to CDISE. (*See* Duignan Aff. ¶ 4.) Thus, there is evidence that Defendants denied Plaintiffs access to these electronic Business Records by removing the server that would have allowed Plaintiffs to access copies of those records. *See HCW Ret. & Fin. Servs., LLC v. HCW Emp. Benefit Servs., LLC*, 2015 NCBC LEXIS 73, at \*61–62 (N.C. Super. Ct. July 14, 2015) (concluding electronic information stored in a database was subject to a conversion claim when defendant cut off plaintiff's ability to access). Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that a genuine dispute of material fact exists as to whether Plaintiffs were deprived of access to their electronic Business Records contained on the server removed from CDISE. As a result, Defendants' Motion seeking dismissal of Plaintiffs' claim for the alleged conversion of these electronic Business Records must be denied.

127. Plaintiffs also claim that Defendants converted CDISE's electronic Business Records—specifically SOWs and Quotes—that were prepared using the Quotewerks system. Plaintiffs have produced evidence showing that, while still working at CDISE, Brown and other employees started using Quotewerks to prepare SOWs and Quotes for CDISE customers in anticipation of their departure from CDISE. (Pls.' Dep. Excerpts, at 8, 18, ECF No. 140; Pls.' Dep. Excerpts (Sealed), 44–46, 55.)

128. During the transition period, the Quotewerks system pulled customer information from CDISE's comparable system, Connectwise. (Pls.' Dep. Excerpts (Sealed), 45–46.) At some point, Defendants noticed that the system wrote back the

information contained in the SOWs and Quotes to CDISE's Connectwise software system. (Pls.' Dep. Exs. Vol. 1, Ex. 22, 47.) Plaintiffs allege—and produce documents showing—that Defendants broke the link to Connectwise, which prevented CDISE from capturing any of the SOWs and Quotes that Brown and his team prepared while they worked for CDISE—documents Plaintiffs contend were theirs. (Pls.' Dep. Exs. Vol. 1, Ex. 22, 47.)

129. Defendants argue that Plaintiffs cannot claim conversion of the Quotewerks system because it was a system never used by CDISE; rather, it was only used in anticipation of Defendants' spinoff from CDISE. Defendants, however, misapprehend Plaintiffs' position. Plaintiffs do not claim they were deprived of the right to use Quotewerks. Rather, Plaintiffs claim that Defendants used Quotewerks to deprive CDISE from obtaining SOWs and Quotes that rightfully belonged to CDISE. As such, Plaintiffs contend they have brought forward sufficient evidence that Defendants converted these electronic records.

130. Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have forecasted sufficient evidence that Defendants interrupted CDISE's link to the Connectwise system and thus deprived CDISE of access to CDISE's SOWs and Quotes to sustain Plaintiffs' conversion claim under Rule 56. *See Gadson v. Toney*, 69 N.C. App. 244, 246, 316 S.E.2d 320, 322 (1984) (concluding summary judgment was improper where evidence did not establish defendant's legal right to plaintiff's allegedly converted property as a matter of law).

B. Plaintiffs' Motion

1. Declaratory Judgment

131. Plaintiffs seek summary judgment on Brown's individual and derivative claims for declaratory judgment relating to CDI's deemed withdrawal as a member of CDISE under the Operating Agreement. For the reasons set forth in section III(A)(1) above, Plaintiffs' Motion must be denied.

2. Judicial Dissolution

132. Plaintiffs seek dismissal of Brown's claim for judicial dissolution of CDISE, which Brown asserts as an alternative to his declaratory judgment claims. Brown's claim for judicial dissolution posits that if CDI is not deemed withdrawn as a member of CDISE, then he and CDI remain as CDISE's only two members and that it is not practicable for them to conduct CDISE's business under the Operating Agreement. Brown further claims that dissolution is necessary to protect his interest in CDISE, citing CDISE's recent financial setbacks as support. Through their Motion, Plaintiffs contend that Brown has not proffered sufficient evidence to show that dissolution is an appropriate remedy under the undisputed facts of record. The Court agrees with Plaintiffs.

133. An LLC member may bring a claim for dissolution, and a court may dissolve an LLC, where "it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and [the LLC Act] or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member." N.C. Gen. Stat. § 57D-6-02(02). Judicial "[d]issolution is an equitable

remedy; therefore, before granting such a remedy, the Court 'must exercise its equitable discretion, and consider the actual benefit and injury to [all of] the shareholders resulting from dissolution.'" *Brady v. Van Vlaanderen*, 2017 NCBC LEXIS 61, at *24 (N.C. Super. Ct. July 19, 2017) (quoting *Meiselman v. Meiselman*, 309 N.C. 279, 297, 307 S.E.2d 551, 562 (1983)).[16]

134. The Court concludes, on the undisputed facts of record, that Brown has failed to come forward with sufficient evidence to permit a factfinder to conclude that dissolution is necessary to protect Brown's interests or for the Court to determine that dissolution is an appropriate equitable remedy. To the contrary, CDI is the managing member of CDISE with "full, complete and exclusive authority, power and discretion to direct, manage and control the business, affairs and assets of [CDISE]," (Operating Agmt. § 6.1), and wishes to continue managing CDISE. To that end, CDI has caused CDISE to hire a number of new employees since Brown's departure and CDISE continues to operate its business. Brown has not offered any evidence that CDI has mismanaged CDISE, wasted its assets, or otherwise caused CDISE to suffer financial loss through malfeasance or incompetence. Indeed, the undisputed evidence shows that CDISE's recent setbacks occurred after Brown went into competition with CDISE through Rove, caused Rove to hire at least twenty-four CDISE employees, and

---

[16] *Meiselman* involved the dissolution of a closely held corporation. *See Meiselman*, 309 N.C. at 297, 307 S.E.2d at 562. While the provisions in the General Statutes for dissolution of a closely held corporation and dissolution of an LLC are very similar, "North Carolina appellate courts have not yet addressed whether a claim pursuant to section 57D-6-02(2) is governed by the same principles as a *Meiselman* claim under Chapter 55." *Pure Body Studios Charlotte, LLC v. Crnalic*, 2017 NCBC LEXIS 98, at *13 (N.C. Super. Ct. Oct. 18, 2017) (quoting *Brady*, 2017 NCBC LEXIS 61, at *31–32).

caused Rove to obtain contracts with former CDISE customers, including Octapharma, Ally, and Sunbelt. At most, Brown has shown that he and CDI have a disagreement over Brown's failed acquisition of CDISE, not that it is impracticable for CDISE to continue conducting business in conformity with the Operating Agreement and the LLC Act. Our courts have made clear that such a showing is insufficient to sustain a dissolution claim. *See, e.g.*, *Brady*, 2017 NCBC LEXIS 61, at *31–33 (dismissing dissolution claim on summary judgment where plaintiff failed to produce evidence supporting contention that LLC was mismanaged and its assets wasted and observing that a "claim for judicial dissolution is not intended to police disagreements among members that are not accompanied by proof of substantial mismanagement or financial loss"); *see also Dunbar Group, LLC v. Tignor*, 593 S.E.2d 216, 218–19 (Va. 2004) (reversing order of dissolution where claimant alleged "serious differences of opinion as to company management" and that company was deadlocked even after expulsion of fifty-percent member).[17]

135. Nor has Brown offered evidence showing that liquidation is necessary to protect his interest in CDISE. In particular, he has not offered any evidence that CDI has violated his rights as an LLC member, operated CDISE in a manner resulting in harm to his interest, or otherwise shown that any frustration of his reasonable expectations as a CDISE member was because of actions other than his own. The Court therefore concludes that Brown has not provided sufficient evidence to show that judicial dissolution is necessary to protect his expectation or interest in

---

[17] Virginia's dissolution statute is very similar to North Carolina's. *See* Va. Code Ann. § 13.1-1047.

CDISE. *See Meiselman*, 309 N.C. at 301, 307 S.E.2d at 564 (noting that a plaintiff seeking dissolution of a corporation must show that the frustration of plaintiff's reasonable expectations "was without fault of plaintiff and was in large part beyond his control"); *Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 708, 529 S.E.2d 515, 520 (2000) (noting that "there must be some causal connection between the frustration of the shareholder's reasonable expectations and his faulty behavior" in order for fault to bar dissolution and that "a shareholder with an expectation in secure employment would be barred from seeking dissolution if he embezzled money from the company").

136. For each of these reasons, the Court concludes that Brown's claim for judicial dissolution should be dismissed.

### 3. Fraud, Fraudulent Concealment, and Negligent Misrepresentation

137. Brown brings claims, in his individual capacity only, for fraud, fraudulent concealment, and negligent misrepresentation against CDI, Reid, and Bakker for allegedly preparing and providing false financial statements.[18] Plaintiffs claim they are entitled to summary judgment because Brown cannot show fraudulent intent, reasonable reliance, or the existence of damages—necessary elements to one or more of these claims.[19]

---

[18] Although Plaintiffs contended that Brown's fraud claim was partly based on a failure to pay certain guaranteed payments to Brown, Brown later clarified that "he is not basing his fraud claim on that conduct." (Defs.' Br. Opp'n Pls.' Mot. Summ. J. 14 n.2, ECF No. 156.)

[19] Plaintiffs also claim that the fraudulent concealment claim should not proceed because Brown has failed to show that he was owed any duty by those who allegedly committed the purported fraud.

138. To prevail on a claim for fraudulent misrepresentation or concealment, a plaintiff must show "(1) [a] [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007). To establish a claim for negligent misrepresentation, a party must show that he "(1) justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care." *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 700, 671 S.E.2d 7, 12 (2009). The torts of fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation each require a showing of actual damages. *See Forbis*, 361 N.C. at 526–27, 649 S.E.2d at 387; *Speller v. Speller*, 273 N.C. 340, 343, 159 S.E.2d 894, 896 (1968) ("In order to establish fraud, there must be a showing of actual loss, injury or damage."); *Hardin v. KCS Int'l., Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009) (listing damages as an element of fraudulent concealment); *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589, 581 S.E.2d 68, 76 (2003) (noting that actual damages are an "essential element" of negligent misrepresentation); *Hawkins*, 101 N.C. App. at 532–32, 400 S.E.2d at 474–75 (requiring actual damages for fraudulent misrepresentation).

139. Brown claims he "was damaged at least to the extent that CDISE had to pay [an outside accounting firm] to fix the sales tax issue." (Defs.' Br. Opp'n Pls.' Mot. Summ. J. 22, ECF No. 156.) Thus, as framed by Brown, it is undisputed that any damages arising out of CDISE's tax delinquencies were incurred only by CDISE.

Brown, however, has asserted his claims for fraud, fraudulent concealment, and negligent misrepresentation in his individual capacity rather than as derivative claims on behalf of CDISE, the allegedly damaged party. *See Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658–59, 488 S.E.2d 215, 219 (1997) (noting that a shareholder "may maintain an individual action against a third party for an injury that directly affects the shareholder . . . [only] if the shareholder can show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself."). Because Brown has not offered any evidence that CDI, Reid, or Bakker owed him a special duty or that he has suffered a separate and distinct injury in connection with these claims, Brown's claims for fraud, fraudulent concealment, and negligent misrepresentation should be dismissed. *See id.* at 659, 488 S.E.2d at 220 ("The only injury plaintiffs as shareholders allege is the diminution or destruction of the value of their shares as the result of defendants' negligent or fraudulent misrepresentations of TFH's financial status. This is precisely the injury suffered by the corporation itself."). Moreover, it is undisputed that to the extent CDISE suffered injury due to the conduct underlying these claims, those damages resulted from CDISE's nonpayment of taxes, not because of any negligent or fraudulent misrepresentation or concealment to Brown.

140. Brown contends that these claims should proceed nonetheless because the jury could award nominal damages on each, citing *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2012 U.S. Dist. LEXIS 63707 (E.D.N.C. May 7,

2012). *Silicon Knights*, however, held that a plaintiff must first establish the complete cause of action before recovering nominal damages on any of these claims. *Id.* at *26–27 (applying North Carolina law, which holds "once a cause of action is established, a plaintiff is entitled to recover, as a matter of law, nominal damages." (quoting *Hawkins v. Hawkins*, 331 N.C. 743, 745, 417 S.E.2d 447, 449 (1992))). As discussed above, fraud, fraudulent concealment, and negligent misrepresentation each require actual damages as an element of the claim, and Brown has failed to offer any such evidence.

141. Accordingly, for the reasons above, the Court concludes that Brown's claims for fraud, fraudulent concealment, and negligent misrepresentation should be dismissed. In light of the Court's resolution, the Court need not address Plaintiffs' other arguments for dismissal of these claims.

4. Unfair and Deceptive Trade Practices

142. Plaintiffs next seek dismissal of Brown's individual and derivative claims against CDI, Reid, and Bakker for unfair or deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"), N.C. Gen. Stat. § 75-1.1. To succeed on a UDTPA claim, a plaintiff must prove "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593, 619 S.E.2d 577, 582 (2005) (quoting *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991)). "A practice is unfair if it is unethical or unscrupulous, and

it is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

143. While the UDTPA broadly defines "commerce" to include "all business activities, however denominated," N.C. Gen. Stat. § 75-1.1(b), our courts have held that the statute "is not intended to apply to all wrongs in a business setting," *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991). Particularly at issue here, "any unfair or deceptive conduct contained solely within a single business is not covered by [the UDTPA]." *White v. Thompson*, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010) (holding acts were not "in or affecting commerce" under the UDTPA where defendant "unfairly and deceptively interacted only with his partners, [and] his conduct occurred completely within the . . . partnership"); *see Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 358, 578 S.E.2d 692, 694 (2003) ("Matters of internal corporate management . . . do not affect commerce" for purposes of section 75-1.1); *Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *17–18 (N.C. Super. Ct. July 26, 2018) (collecting cases and dismissing section 75-1.1 claim premised on internal corporate dispute); *Wheeler v. Wheeler*, 2018 NCBC LEXIS 38, at *14 (N.C. Super. Ct. Apr. 25, 2018) (dismissing UDTPA claim in "dispute between the shareholders of a corporation regarding its internal management and *the shareholders' right to fair value for their ownership interest*" (emphasis added)).

144. Brown's UDTPA claims here arise from his allegations that CDI, Reid (who served as CDI's CFO), and Bakker (who served as CDISE's Vice President) provided

false financial information for CDISE while Brown was negotiating the purchase of CDI's ownership interest.[20] Because Brown's UDTPA claims arise from acts related to one member's buyout of another member's interest in an LLC, the Court concludes that the claims arise from an internal dispute between business co-owners. As such, the Court concludes that Brown cannot show that the acts underlying his section 75-1.1 claim were "in or affecting commerce" as a matter of law. Brown's UDTPA claim therefore must be dismissed on this basis. *Dalton*, 353 N.C. at 657–58, 548 S.E.2d at 711 (affirming grant of summary judgment dismissing UDTPA claim where alleged conduct and potential unfairness were confined within a single business); *JS Real Estate Invs. LLC v. Gee Real Estate, LLC*, 2017 NCBC LEXIS 104, at *21 (N.C. Super. Ct. Nov. 9, 2017) (granting summary judgment in dispute between LLC members); *Kingsdown, Inc. v. Hinshaw*, 2015 NCBC LEXIS 30, at *28–29 (N.C. Super. Ct. March 25, 2015) (dismissing UDTPA claim which "plainly involve[d] internal business disputes rather than interactions with businesses or consumers"); *McKee v. James*, 2014 NCBC LEXIS 74, at *42 (N.C. Super. Ct. Dec. 31, 2014) (granting summary judgment where "the undisputed evidence of record d[id] not reveal a dispute between [the company] and another business or consumers at large, but rather a dispute between . . . co-owners").

---

[20] Brown's allegations supporting his UDTPA claims are "substantially the same" as those supporting his fraud claim. (Defs.' Br. Opp'n Pls.' Mot. Summ. J. 22.) Indeed, "[p]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts[.]" *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991). The alleged fraudulent acts, however, must be "in or affecting commerce" to sustain a section 75-1.1 claim. *Id.*; *see JS Real Estate Invs. LLC v. Gee Real Estate, LLC*, 2017 NCBC LEXIS 104, at *20–21 (N.C. Super. Ct. Nov. 9, 2017).

145. In addition, the Supreme Court of North Carolina has also made clear that "any unfair or deceptive practices occurring in the conduct of extraordinary events of . . . a business will not give rise to a claim under the [UDTPA]." *White*, 364 N.C. at 52, 691 S.E.2d at 679. In that regard, the Supreme Court has held that "'[b]usiness activities' [under section 75-1.1] is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493; *see, e.g.*, *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2017 NCBC LEXIS 68, at *14 (N.C. Super. Ct. Aug. 4, 2017) (dismissing UDTPA claim after concluding "that the conduct underlying Plaintiff's . . . claim constitute[d] an 'extraordinary event' tied to the 'change in ownership of the security [at issue]" (quoting *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493)).

146. Brown bases his section 75-1.1 claim on the preparation and provision of false financial statements in anticipation of Brown's proposed acquisition of CDISE. Such activities in connection with Brown's contemplated acquisition, however, do not "connote[] the manner in which businesses conduct their regular, day-to-day activities, or affairs," *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493. Rather, the activities in furtherance of Brown's proposed acquisition are part of an "extraordinary event" that is beyond the reach of section 75-1.1. *See, e.g.*, *Latigo Invs. II, LLC v. Waddell & Reed Fin., Inc.*, 2007 NCBC LEXIS 17, at *11–12 (N.C. Super. Ct. June 11, 2007) (applying *HAJMM* to dismiss section 75-1.1 claim where defendants

reneged on agreement to purchase an ownership stake in plaintiff's company). Brown's UDTPA claim must therefore be dismissed for this separate and independent reason.

147. Finally, as an alternative factual basis for his UDTPA claims, Brown asserts that CDI, Reid, and Bakker directed CDI's Managed Services division to improperly access the iCloud and iMessage accounts of former CDISE employees. Brown does not allege or offer evidence, however, that his own accounts were accessed or that he otherwise suffered injury from the conduct he alleges. The only injury he claims is to other former CDISE employees, and Brown has offered no evidence to show that he has standing to assert this claim on their behalf. *See, e.g.*, *Bruggeman*, 165 N.C. App. at 795, 600 S.E.2d at 511 ("Standing requires that the plaintiff have been injured or threatened by injury or have a statutory right to institute an action[.]" (internal quotation marks omitted). Because standing "is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction[,]" *Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002), and is a "question of law" for the court, *McCrann*, 225 N.C. App. at 372, 737 S.E.2d at 775, the Court concludes that Brown lacks standing to assert his UDTPA claims based on allegedly improper access to former CDISE employees' iCloud or iMessage accounts. As such, Brown's UDTPA claims based on this alleged conduct should be dismissed for lack of subject matter jurisdiction.

148. Moreover, even if Brown could overcome this jurisdictional hurdle, he fails to offer any evidence to support his alternative factual contention, relying solely upon

a counterclaim allegation made "[u]pon information and belief," (Countercls. ¶ 90; Am. Countercls. ¶ 168), that the Court may not consider on summary judgment, *see Asheville Sports Props., LLC*, 199 N.C. App. at 345, 683 S.E.2d at 220 (finding allegations made "upon information and belief" incompetent for summary judgment purposes).

149. Accordingly, for each of the reasons set forth above, the Court concludes that Brown's individual and derivative claims against CDI, Reid, and Bakker under Chapter 75 should be dismissed.[21]

### 5. Gross Mismanagement

150. Brown asserts a derivative claim on behalf of CDISE against CDI, Bakker, Reid, Reid Accounting, "and/or" N&R for gross mismanagement, contending that these parties failed to properly handle CDISE's accounting, tax, and financial matters and wasted CDISE's assets. Plaintiffs contend that the claim as to Reid Accounting and N&R[22] should be dismissed because those two entities were never officers or directors of CDISE, and did not owe a duty of care to CDISE on which a claim for gross mismanagement may be based. The Court agrees.

151. Our courts have recognized that a claim for gross mismanagement against a director of a corporation is a proper derivative claim. *Green v. Condra*, 2009 NCBC LEXIS 20, at *30 (N.C. Super. Ct. Aug. 14, 2009) (citing *Corp. Comm'n of N.C. v.*

---

[21] In light of the Court's dismissal of Brown's fraud claims, Brown's unfair or deceptive trade practices claim must also be dismissed to the extent it is based on Brown's individual fraud allegations.

[22] Plaintiffs did not seek summary judgment on Brown's gross mismanagement claim against CDI, Bakker, and Reid.

*Merchants' Bank & Tr. Co.*, 193 N.C. 113, 115, 136 S.E. 362, 363 (1927)). This right of action has been codified in N.C. Gen. Stat. § 55-8-30(a), which outlines the general standards for directors and provides a cause of action when a director violates his statutory duty of care. *Green*, 2009 NCBC LEXIS 20, at *30 (citing N.C. Gen. Stat. § 55-8-30(a)(2)); *see also* N.C. Gen. Stat. § 55-8-42 (outlining standards of care for officers and establishing a cause of action against officers). North Carolina courts have not, however, recognized a claim for gross mismanagement against a person or entity who is not a corporate officer or director. Even if our courts were to recognize such a claim, Brown has failed to bring forward evidence showing that any of these Third-Party Defendants owed him a fiduciary duty on which such a claim could be based. Accordingly, Plaintiffs' Motion is granted to the extent that it seeks dismissal of Brown's claim for gross mismanagement against Reid Accounting and N&R.

### 6. Professional Negligence

152. Brown asserts a derivative claim on behalf of CDISE against Reid, Reid Accounting, and N&R for professional negligence, contending that these parties failed to (i) remit sales and use tax reports and payments, (ii) provide accurate financial reports, and (iii) keep true and accurate books and records. Plaintiffs contend that the professional negligence claims should be dismissed because Brown has not designated an expert to testify as to the applicable standard of care for each of these allegedly negligent actions.

153. To establish professional negligence, "the plaintiff bears the burden of showing: (1) the nature of the defendant's profession; (2) the defendant's duty to

conform to a certain standard of conduct; and (3) a breach of the duty proximately caused injury to the plaintiffs." *Frankenmuth Ins. v. City of Hickory*, 235 N.C. App. 31, 35, 760 S.E.2d 98, 101 (2014) (quotation marks omitted). A claimant is required to establish the standard of care for a professional negligence claim through expert testimony "[w]here the common knowledge and experience of the jury is [not] sufficient to evaluate compliance with a standard of care[.]" *Id.* (quoting *Michael v. Huffman Oil Co.*, 190 N.C. App. 256, 271, 661 S.E.2d 1, 11 (2008)). The "common knowledge" exception to expert testimony in professional negligence cases "is implicated where the conduct is gross, or of such a nature that the common knowledge of lay persons is sufficient to find the standard of care required, a departure therefrom, or proximate causation." *Handex of the Carolinas, Inc. v. County of Haywood*, 168 N.C. App. 1, 11, 607 S.E.2d 25, 31 (2005) (internal quotation marks omitted). When a plaintiff fails to establish the proper standard of care through expert testimony, summary judgment is appropriate. *See id.*

154. Brown contends that a jury's common knowledge is sufficient to evaluate the standard of care to be applied to each aspect of his professional negligence claim and thus that expert testimony is not necessary to sustain his claim. North Carolina courts have not addressed whether expert testimony is required for a professional negligence claim against accountants, but other jurisdictions examining the issue have found that expert testimony is generally required. *See, e.g., Hassebrock v. Bernhoft*, 815 F.3d 334, 343 (7th Cir. 2016) ("[E]stablishing the duty of care for accountants requires expert testimony."); *In re Puda Coal Sec., Inc.*, 30 F. Supp. 3d

230, 249 (S.D.N.Y. 2014) ("In accounting malpractice cases, in which a mere negligence standard could be sufficient to establish liability, expert testimony is typically required."); *Brown-Wilbert, Inc. v. Copeland Buhl & Co.,* 732 N.W.2d 209, 218 (Minn. 2007) (holding plaintiff asserting accounting malpractice claim must present expert testimony identifying applicable standard of care and opining that accountant deviated from that standard and that departure caused plaintiff's damages); *Great S. Excavators, Inc. v. TEC Partners, LLP,* 231 So. 3d 1011, 1014 (Miss. Ct. App. 2017); *Buke, LLC v. Cross Country Auto Sales, LLC,* 331 P.3d 942, 955 (N.M. Ct. App. 2014) ("[W]e hold that the same principles that govern the necessity for expert testimony in other kinds of professional malpractice cases apply to accountant malpractice cases."); *Gertler v. Sol Masch & Co.,* 835 N.Y.S.2d 178, 179 (App. Div. 2007).

155. Here, the Court concludes that expert testimony is necessary to support some, but not all, of Brown's professional negligence claims. First, with respect to the claim that Reid, Reid Accounting, and N&R failed to timely report and remit sales and use taxes, Brown argues that the jury will not need to evaluate the quality of Reid's, Reid Accounting's, and N&R's work, but solely whether each failed to remit payment of CDISE's sales and use tax obligations in North and South Carolina when they were due. The Court agrees.

156. Beginning in 2011, CDISE was responsible for remitting sales and use taxes and began collecting sales and use taxes from its customers. CDISE did not remit sales and use taxes, however, until 2015. It is undisputed that CDISE had an

obligation to remit sales and use taxes to North and South Carolina beginning in 2011. CDI, as Tax Matters Partner of CDISE, was responsible for overseeing CDISE's tax matters and engaged Reid as a consultant to handle such matters.[23] Although the "boundary line between [sales and use taxes] is narrow and oftentimes difficult to trace with accuracy[,]" *Johnston v. Gill*, 224 N.C. 638, 643, 32 S.E.2d 30, 33 (1944), a jury in this case will not be asked to determine whether sales and use taxes were due or the basis for any tax assessments. Rather, the point Brown seeks to prove is simply that a tax consultant handling a business entity's tax matters should know that admittedly owed sales and use taxes must be timely paid when due and that failure to do so will cause the entity to incur interest and suffer late payment penalties. The Court finds that such a proposition is within the common knowledge of a typical juror and need not be established through expert testimony.

157. The Court finds unpersuasive Plaintiffs' argument that an expert must offer testimony as to how the sales and use taxes are to be filed for Brown's professional negligence claim to survive summary judgment. Just as a jury need not know how to file a civil complaint to assess whether an attorney was negligent in failing to file before the statute of limitations expired, *see e.g.*, *Little v. Matthewson*, 114 N.C. App. 562, 568, 442 S.E.2d 567, 571 (1994) ("It does not require expert testimony to establish the negligence of an attorney who is ignorant of the applicable statute of

[23] The Operating Agreement specifically states that the Tax Matters Partner "shall oversee [CDISE's] tax affairs in the overall best interests of [CDISE]" and represent CDISE "in connection with all examinations of [CDISE]'s affairs by tax authorities, including any resulting judicial and administrative proceedings, and . . . expend [CDISE] funds for professional services and costs associated therewith." (Operating Agreement § 11.5.)

limitations or who sits idly by and causes the client to lose the value of his claim for relief."), the mechanics of sales and use tax filing are not necessary to comprehend whether a tax consultant handling a company's tax matters should have filed sales and use taxes when they came due.

158. In contrast, whether Reid, Reid Accounting, and N&R failed to provide accurate financial statements and failed to maintain proper books and records cannot proceed to the jury without expert testimony. Under the Operating Agreement, CDISE's books and records were to be maintained in accordance with the accrual basis of accounting, (Operating Agreement § 11.2), a matter other courts have found not within the common knowledge of laypersons, *see Hassebrock v. Bernhoft*, No. 10-CV-0679-NJR-DGW, 2014 U.S. Dist. LEXIS 186759, at \*16–17 (S.D. Ill. Aug. 25, 2014) (granting summary judgment on accounting malpractice claim based on preparation of grossly inaccurate tax returns because plaintiff failed to offer expert testimony); *SEC v. Guenthner*, 395 F. Supp. 2d 835, 846 (D. Neb. 2005) ("Establishing that an accounting practice or method is inconsistent with GAAP requires expert testimony."); *Seaward Int'l, Inc. v. Price Waterhouse*, 391 S.E.2d 283, 287 (Va. 1990) ("The definition of 'generally accepted auditing standards,' and the application of that definition to the facts of a particular case, are matters beyond the common knowledge of laymen."). Similarly, the preparation of CDISE's financial statements and the evaluation of CDISE's compliance with its financial reporting obligations are not matters within the common knowledge of laypersons. *Compare Frankenmuth Ins.*, 235 N.C. App. at 36, 760 S.E.2d 98 at 102 (requiring expert testimony where "alleged

wrongdoing of defendant . . . required the exercise of professional judgment regarding a 'reasonable' level of water pressure in a municipal water system, the skill needed to install a 'loop' system, and the expertise to install or recommend installing a pressure-relieving device at the terminal ends of the system."), *and Delta Envtl. Consultants of N. Carolina, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 168, 510 S.E.2d 690, 696 (1999) (expert testimony required for the standard of care utilized by professional engineers in environmental cleanup), *with Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 411–12, 590 S.E.2d 866, 871 (2004) (within common knowledge exception where trier of fact could adequately determine whether surveyor correctly measured ninety-degree angles in its design of a rectangular building site).

159. Accordingly, the Court grants Plaintiffs' Motion to the extent it seeks dismissal of Brown's claims against Reid, Reid Accounting, and N&R for professional negligence based on their alleged failure to provide accurate financial reports and to keep true and accurate books and records. The Court denies Plaintiffs' Motion to the extent it seeks dismissal of Brown's claims for professional negligence based on Reid, Reid Accounting, and N&R's alleged failure to timely remit sales and use tax reports and payments.

IV.

CONCLUSION

160. **WHEREFORE**, the Court, for the foregoing reasons, hereby **ORDERS** as follows:

a. Defendants' Motion for Partial Summary Judgment is **GRANTED in part** and **DENIED in part** as follows:

i. The Court **DENIES** Defendants' Motion as to Brown's individual and derivative claims for declaratory judgment, and those claims shall proceed to trial.

ii. The Court **DENIES** Defendants' Motion as to CDI's individual and derivative claims to the extent Brown seeks dismissal of those claims based on CDI's withdrawal from CDISE.

iii. The Court **DENIES** Defendants' Motion as to Plaintiffs' claim against Defendants for misappropriation of trade secrets to the extent it relates to the Identifiable Trade Secrets, as defined herein, and such claim shall go forward to trial. The Court **GRANTS** Defendants' Motion as to Plaintiffs' claim against Defendants for misappropriation of trade secrets to the extent it relates to information that is not an Identifiable Trade Secret, and dismisses that claim with prejudice.

iv. The Court **GRANTS** Defendants' Motion as to Plaintiffs' claim against Defendants for tortious interference with contract, and dismisses that claim with prejudice.

v. The Court **DENIES** Defendants' Motion as to Plaintiffs' claim against Defendants for tortious interference with prospective economic advantage with respect to CDISE's prospective business

with Octapharma, Ally, and Sunbelt Rentals and that claim shall go forward to trial. The Court **GRANTS** Defendants' Motion as to Plaintiffs' claim against Defendants for tortious interference with prospective economic advantage to the extent the claim is based on CDISE's prospective business with any person or entity other than Octapharma, Ally, or Sunbelt Rentals, and dismisses that claim with prejudice.

vi. The Court **GRANTS** Defendants' Motion as to Plaintiffs' claim against Jacoby for breach of the confidentiality agreement, and dismisses that claim with prejudice.

vii. The Court **GRANTS** Defendants' Motion as to Plaintiffs' claim against Brown for failure to negotiate in good faith, and dismisses that claim with prejudice.

viii. The Court **DENIES** Defendants' Motion as to Plaintiffs' claim against Defendants for conversion to the extent it relates to the Computer Hardware and electronic Business Records, and those claims shall go forward to trial. The Court **GRANTS** Defendants' Motion as to Plaintiffs' conversion claim against Defendants to the extent it relates to Sunbelt Equipment and tangible Business Records, and dismisses those claims with prejudice.

b. Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

i. The Court **DENIES** Plaintiffs' Motion as to Brown's individual and derivative claims for declaratory judgment, and such claims shall go forward to trial.

ii. The Court **GRANTS** Plaintiffs' Motion as to Brown's claim against CDISE for judicial dissolution of CDISE, and dismisses that claim with prejudice.

iii. The Court **GRANTS** Plaintiffs' Motion as to Brown's claims against CDI, Reid, and Bakker for fraud, fraudulent concealment, and negligent misrepresentation, and dismisses those claims with prejudice.

iv. The Court **GRANTS** Plaintiffs' Motion as to Brown's individual and derivative claims against CDI, Reid, and Bakker for unfair and deceptive trade practices under section 75-1.1, and dismisses those claims with prejudice.

v. The Court **GRANTS** Plaintiffs' Motion as to Brown's derivative claim against Reid Accounting and N&R for gross mismanagement, and dismisses that claim with prejudice.

vi. The Court **DENIES** Plaintiffs' Motion as to Brown's derivative claim against Reid, Reid Accounting, and N&R for professional negligence to the extent it relates to Reid, Reid Accounting, and N&R's alleged failure to remit sales and use tax reports and payments, and that claim shall go forward to trial. The Court

**GRANTS** Plaintiffs' Motion as to Brown's derivative claim against Reid, Reid Accounting, and N&R for professional negligence to the extent it relates to their alleged failure to provide accurate financial reports and to keep true and accurate books and records, and dismisses that claim with prejudice.

**SO ORDERED**, this the 10th day of December, 2018.[24]

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[24] This Order and Opinion was originally filed under seal on December 10, 2018. This public version of the Order and Opinion is being filed on December 14, 2018. Because this public version of the Order and Opinion does not contain any substantive changes from the version filed under seal as to constitute an amendment, and to avoid confusion in the event of an appeal, the Court has elected to state the filing date of the public version of the Order and Opinion as December 10, 2018.